**In re Emil LANGE.**

**Appeal No. 80–568.**

United States Court of Customs and Patent Appeals.

March 12, 1981.

Donald D. Evenson, Paul M. Craig, Jr., Davis S. Safran, Washington, D. C., for appellant; Joseph F. Nakamura, Washington, D. C., Sol., Jere W. Sears, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

MILLER, Judge.

This is an appeal from a decision of the Patent and Trademark Office ("PTO")

Board of Appeals ("board") which affirmed the examiner's rejections of claims 28, 31, and 42 on Cobine et al.[1] ("Cobine") under 35 U.S.C. § 102, and, under 35 U.S.C. § 103, claims 29, 30, and 32–34 on Cobine, claims 35–41 on Cobine in view of Farrer et al.[2] ("Farrer"), and claims 28–42 on appellant's German Auslegeschrift No. 1,285,594 (" '594"), published December 19, 1968, in view of appellant's British patent No. 1,205,646 (" '646"), published September 16, 1970. Appellant's application serial No. 254,537 was filed May 18, 1972, for "Electric Circuit Breaker With Means for Quenching Electric Arcs," as a continuation-in-part of application serial No. 719,763 ("parent"), filed April 8, 1968, which is a continuation of application serial No. 429,194 ("grandparent"), filed January 18, 1965. We reverse the board's decision affirming the rejections of claims 28, 31, and 42 under 35 U.S.C. § 102 and claims 28–42 under 35 U.S.C. § 103 on the '594 and '646 references. We affirm the board's decision approving the rejections under 35 U.S.C. § 103 of claims 29, 30, and 32–34 on Cobine and claims 35–41 on Cobine in view of Farrer.

*The Invention*

The invention relates to a circuit breaker which quenches an electric arc produced between electrodes by use of an electronegative gas, such as sulphur hexafluoride ("$SF_6$"), selenium hexafluorideride ("$SeF_6$"), trifluoromethylsulphur pentafluoride ("$CF_3 SF_5$"), or sulphur pentafluoride ("$SF_5$") which is released from electrodes consisting of metallic and nonmetallic substances by the heat of the arc. The metallic substances include metals having strong cohesive forces such as tungsten and molybdenum. The nonmetallic substances are those which generate the desired electronegative gas when heated by an arc, such as an adduct of polytetrafluoride, possibly together with sulphur. Fluorine, sulphur or selenium is admixed with the nonmetallic substances. Figure 1 is illustrative:

*Fig. 1.*

The apparatus includes an arc quenching chamber 1, a fixed contact 2 electrically connected to a tubular electrode 7, a movable switch pin 3 having a contact tip 8 which operates as an electrode, spaces 4 and 5, partition 6, ring electrode 9, and electrically conductive connection piece 10. The electrodes 7, 8, and 9 are formed of the metallic and nonmetallic substances by melting, casting, sintering, decomposing, or superimposing the substances.

In order to break the circuit, the switch pin 3 is withdrawn from fixed contact 2; as this occurs, an arc is struck between electrodes 7 and 8. The heat from the arc causes electronegative gas to be emitted in the space 4 from the electrode surfaces. This gas aids in quenching the arc by forming negative ions having a great electron affinity. As the pin 3 continues to be withdrawn, tip 8 passes through the ring electrode 9 so that the arc burns between the electrode 7, the ring electrode 9, and the tip 8. The electronegative gas emitted from tip 8 and electrodes 7 and 9 increases the

1. United States Patent No. 3,021,409, issued February 13, 1962.

2. United States Patent No. 2,267,399, issued December 23, 1941.

gas pressure in space 4. As the tip 8 leaves space 4 and enters space 5, the gas contained in space 4 rushes into space 5 through the ring electrode 9 exposing the arc to the gas.

Appellant's application stresses the importance of the location of the metallic and nonmetallic substances in the electrodes rather than in the walls of the arc quenching chamber.

The following claims are exemplary:

28. An electric circuit breaker comprising a plurality of electrodes between which at least one electric arc burns during circuit breaking, each of said electrodes consisting of a physical combination of metallic material and non-metallic material, said non-metallic material being such as to emit electro-negative arc quenching gas when subjected to the heat of said electric arc, said arc quenching gas having an ultimate dielectric strength of an order of magnitude greater than that of air wherein in and throughout the whole of each of said electrodes said metallic material and said non-metallic material are intimately intermixed and physically united.

35. A device for quenching electric arcs by the use of electronegative gases quenching the arc, especially an electric circuit breaker having quenching chamber walls and arc-drawing parts in the quenching chamber, said arc-drawing parts including electrode means containing at least one metallic substance, characterized in that the electrode means have surface areas serving as base points for the electric arc and the arc-drawing parts are composed of metallic components and non-metallic components giving off electronegative arc-quenching gases under the heat of the electric arc, said arc-quenching gases having an ultimate dielectric strength of an order of magnitude greater than that of air, the non-metallic components being physically combined with the metallic substances of the electrode means at least within the areas of the electrode means serving as base points of the electric arc so that the electronegative arc-quenching gases are given off by the electrode means inside of the arc itself independently of the distance of the quenching chamber walls and substantially immediately upon separation of the arc-drawing parts, and wherein said arc-drawing parts include fixed contact means on the inside of the quenching chamber, movable contact means having a contact tip and normally in contact with said fixed contact means, and at least one electrode means inside said quenching chamber and electrically connected with said fixed contact means, said fixed contact means, said one electrode means and said contact tip being composed of said metallic and non-metallic components, and further including a partition in said quenching chamber spaced from the fixed contact means in the direction of movement of said movable contact means, said partition forming two spaces and including another one of said electrode means arranged in said partition and provided with an opening to accommodate the movable contact means, said another electrode means being also composed of said metallic and non-metallic components so that electronegative gases under pressure flow from the one space containing the fixed contact means into the other space defined by said partition, when the contact pin leaves said one space, thereby quenching any arc which continues to burn between the moving contact tip and said another electrode means.

42. An apparatus for the quenching of electric arcs, especially of electric circuit breakers, in the quenching chamber of which there are provided non-metallic substances which emit, under the heat of the arc itself, electronegative gases which have the property that their molecules have the capability to attach themselves directly to electrons of the arc within the arc itself, said electronegative gases having an ultimate dielectric strength of an order of magnitude greater than that of air, characterized in that said non-metallic substances are intimately intermixed and physically united with the metallic substances of the electrodes serving as the base of the arc.

*The Prior Art*

The references are of two types: those applied against the claims and those cited to establish the level of ordinary skill or knowledge in the art. Cobine is the most pertinent reference applied against the claims and discloses a circuit interrupter having chamber walls which are coated and electrode surfaces which are impregnated with a silicofluoride material which releases silicon tetrafluoride gas ("$SiF_4$") in response to the arc heat. The electrodes are so impregnated that when the gas is released it will sweep through the path of the arc. Because $SiF_4$ has an ultimate dielectric strength of the same order of magnitude as air, Cobine suggests that $SF_6$ could be used to increase the dielectric strength of the gas in the chamber. Farrer discloses specific structure of circuit interrupters which also emit arc-extinguishing gas from the walls of an arc-confining chamber in response to arc heat. The '594 reference is substantially similar to the Lange grandparent application and formed the basis for the grandparent's claim to foreign priority. The '646 reference discloses similar electrodes and chamber structure with additional details concerning manufacture of the electrode chamber.[3]

Three additional references have been made of record, and both the PTO and appellant appear to agree that they indicate the level of ordinary skill in the art. The Mandelcorn et al. patent[4] ("Mandelcorn") states that:

[E]lectronegative gases . . . and fluorine compounds may be clathrated. [Process by which molecules of one substance are completely enclosed within another substance.] Particularly useful clathrated products are obtained with fluorine-containing electronegative gases. Examples of such last-mentioned fluorine compounds are sulfur hexafluoride, selenium hexafluoride, and trifluoromethyl sulfur

pentafluoride. Likewise, fluorocarbons such as perfluorobutane and perfluorohexane can be clathrated. The fluorinated and other electronegative gases are particularly suitable when in clathrate form for use in switchgear and circuit breakers. The solid clathrates containing these compounds may be disposed near arcing contacts so that the heat developed by the electrical arc will decompose the clathrate and release copious quantities of the electronegative gas which will assist in interrupting the electrical arc. The clathrate solids may be adhesively coated on the breaker walls to provide a layer thereof near the arcing contacts.

The clathrated solids may be incorporated in various resins, inorganic cements and other binders or products from which it may be desirable to evolve a selected gas.

The following examples illustrate the practice of the invention:

### Example I

The ethanol clathrate of Dianin's compound was dissolved in decahydronaphthalene at a temperature of 90° C., there being sufficient [quantity] of the compound (approximately 50% by weight) to saturate the solution at this temperature. After the ethanol vapors had been completely withdrawn, the hot solution was placed in an autoclave, and sulfur hexafluoride at a pressure of 350 pounds per square inch was admitted to the autoclave. The contents of the autoclave were then agitated and cooled to room temperature (25° C.) to cause the compound to crystallize out of solution. A quantity of fine white crystals precipitated from the solution during the cooling. The pressure of the sulfur hexafluoride was maintained during the entire operation. The white crystals were freed from

3. The '594 and '646 references were published more than one year prior to the filing date of the present continuation-in-part application, but during the pendency of the parent application. If appellant's parent application satisfies the disclosure requirements of 35 U.S.C. § 112,

paragraph 1, his claims are entitled to the parent's filing date, and the rejection based on these references is overcome.

4. United States Patent No. 2,949,424, issued August 16, 1960.

the solvent. They were similar in appearance to granulated sugar. A quantity of the resulting clathrate crystals was heated to a temperature of 165° C. Sulfur hexafluoride in an amount equal to 7½% of the weight of the crystals was released. In this case the empirical formula of the clathrate was $n\,C_{18}H_{20}O_2.SF_6$ where $n$ has an approximate value of 7. The Biersack reference[5] also discloses the use of clathrated materials to extinguish arcs such as Dianin's compound which can be shaped and hardened with adhesive binders and used to coat or form chamber walls of a circuit interrupter. Biersack uses electronegative gases such as $SF_6$, $SeF_6$, and $CF_3SF_5$ which have good dielectric strength. The Lingal et al. patent[6] ("Lingal") describes the electronegative and dielectric properties of $SF_6$ gas and extols its usefulness in circuit interrupters.

*The Board Opinion*

Affirming the examiner's rejection of claims 28, 31, and 42 under 35 U.S.C. § 102 as anticipated by Cobine, the board stated that $SiF_4$ gas emitted by the Cobine electrodes is an electronegative arc quenching gas. With respect to the claim limitation that the electronegative gas have an "ultimate dielectric strength of an order of magnitude greater than that of air," the board said that Cobine discloses the introduction of $SF_6$ as a gas in a closed container and that $SF_6$ has the required dielectric strength; further, that the limitation was not explicitly disclosed in appellant's specification, was generated in response to a rejection on Cobine, and must be considered in light of the Cobine disclosure.

Regarding the rejection of claims 29, 30, 32, 33, and 34 under 35 U.S.C. § 103 on Cobine, the board agreed with the examiner stating that because it was well known "to place materials in an arc chamber which, upon being heated, emitted [$SF_6$] gas" and because Cobine discloses "the obvious alternative of placing gas emitting material either on the insulating structure or directly within the electrode itself," it would have been obvious to a person skilled in the art to incorporate sulfates and fluorides in the Cobine electrodes to generate $SF_6$ gas. The board also affirmed the examiner's rejection of claims 35–41 under 35 U.S.C. § 103 on Cobine in view of Farrer, noting that appellant had only argued the applicability of Cobine.

Finally, the board affirmed the rejection of all claims under 35 U.S.C. § 103 on the '594 reference in view of the '646 reference. Notwithstanding appellant's arguments, it found that these references were prior art to appellant because he was not entitled to rely on his parent's or grandparent's filing dates for priority under 35 U.S.C. § 120. It said that disclosures of the earlier filed applications were not sufficient to support the present claims under 35 U.S.C. § 112, paragraph 1, for two reasons. First, the grandparent specification disclosed the combination of metallic *elements* such as tungsten and molybdenum and nonmetallic *elements* such as fluorine, sulphur, and selenium instead of metallic and nonmetallic compounds or substances incorporating those elements, and because appellant did not disclose how those *elements* might be combined to form the electrodes, he had failed to disclose how to practice the invention.[7] Further, although appellant

5. German Auslegeschrift No. 1,105,947, published May 4, 1961.

6. United States Patent No. 2,798,922, issued July 9, 1957.

7. Appellant's grandparent application stated:
   According to the invention the contact and electrode parts on which the arc burns consist of a combination of metallic elements and non-metallic elements containing electronegative gases. The metallic elements are advantageously united with the non-metallic elements such as fluorine, sulphur, selenium, etc., in order to obtain the sulphur fluorides, sulphur penta-fluoride (SF5), sulphur hexafluoride (SF6), selenium hexafluoride (SeF6) and so forth. As metal [*sic* "metals"] capable of resistance to the effects of the arc there are expediently used metallic elements with great cohesion forces, such as tungsten, molybdenum and so forth, for uniting with the non-metallic elements. The gases of the non-metallic elements are separated off or liberated by the arc burning on the metallic elements or by the arc heat.

submitted an affidavit by an expert that clathrate materials could be used to form the electrodes and were well known in the art, the specification suggests casting, decomposing, or sintering the electrodes, which could not be accomplished with clathrate materials. Second, the claim limitation that the gas have "an ultimate dielectric strength of an order of magnitude greater than that of air" is not found in the earlier disclosures.

## OPINION

### Claims 28, 31, and 42

■ Claims 28, 31, and 42 require that the arc quenching gas *emitted by the nonmetallic material of the electrodes* have an ultimate dielectric strength of an order of magnitude greater than that of air. Cobine discloses that $SiF_4$, the arc quenching gas emitted by the electrodes, has an ultimate dielectric strength of the same order of magnitude as air and that in order to increase the ultimate dielectric strength, a gas of greater dielectric strength such as $SF_6$ could be added to the envelope enclosing the electrodes. The board gave little weight to the cited limitation, saying it was "apparent that such [limitation] comes not from any explicit disclosure in appellant's specification but has been generated in light of [Cobine's disclosure]." However, all limitations in the claims must be found in the reference since the claims measure the invention.[8] *Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 419, 28 S.Ct. 748, 52 L.Ed. 1122 (1908); *In re Royka*, 490 F.2d 981, 984, 180 USPQ 580, 582 (Cust. & Pat.App.1974). Consequently, Cobine does not anticipate the claimed in-

. . . .

The combination or alloy of the metallic elements and the non-metallic elements which emit electro-negative gases can be effected by melting together and casting, by the sintering of powder mixtures, decomposition of compounds, etc. It is however also possible to effect the combination by superimposition in layers and composition of the metallic elements and of the non-metallic elements which emit electronegative gases [*sic*].

vention, and the rejections of claims 28, 31, and 42 under 35 U.S.C. § 102 are reversed.

### Claims 29, 30, and 32–34

■ Appellant argues that Cobine cannot be applied under 35 U.S.C. § 103 and that it would not have been obvious to substitute materials which, appellant admits, were known in the prior art to be capable of emitting $SF_6$ gas, for the materials in the electrodes of the Cobine apparatus capable of emitting $SiF_4$ gas, because the $SiF_4$ gas of Cobine does not serve an arc quenching function, but "serves merely an arc quenching aiding and dielectric strength recovering function." Appellant's expert has stated that $SiF_4$ is an electronegative gas, but that it is not as suitable for quenching the arc due to its ultimate dielectric strength. At oral argument, appellant maintained that $SiF_4$ actually serves to prevent restriking of the arc and not to quench the arc and that due to this difference in functions there would have been no motivation to make a substitution of materials emitting $SF_6$ gas; that, due to the superior results obtained by incorporating materials in the electrodes capable of generating *arc quenching* gas at the base of the arc, the invention was nonobvious.

At the outset, we note that appellant argues against application of Cobine under 35 U.S.C. § 103 as it applies to claim limitations in independent claim 28, and, derivatively, in claims 29, 30, and 32–34. Appellant has not separately argued the limitations added by the dependent claims and, therefore, these claims stand or fall on the limitations contained in claim 28 and not on those added by the dependent claims.[9] *In*

8. If appellant's disclosure fails to support the cited limitation, either expressly or inherently, the proper rejection would have been under 35 U.S.C. § 112, paragraph 1.

9. The rejection of claim 28 was, as related above, under 35 U.S.C. § 102 and not 35 U.S.C. § 103. Our analysis of the rejections of the dependent claims under 35 U.S.C. § 103 will, nevertheless, proceed with respect to the limitations found in the independent claim because every dependent claim includes all limitations of the independent claim.

re Burckel, 592 F.2d 1175, 1179, 201 USPQ 67, 70 (Cust. & Pat.App.1979). At the same time, arguments of counsel over whether $SiF_4$ gas actually functions to quench the arc or merely prevents restriking cannot take the place of evidence. In re Greenfield, 571 F.2d 1185, 1189, 197 USPQ 227, 230 (Cust. & Pat.App.1978). Appellant's argument that superior and unexpected results are obtained by the present invention must be supported by facts. In re Thompson, 545 F.2d 1290, 192 USPQ 275 (Cust. & Pat.App.1976). Its evidence is by way of an affidavit from an expert who concedes that $SiF_4$ is an electronegative gas, although he declares that $SiF_4$ is not as suitable for arc quenching as $SF_6$.

Cobine expressly contemplates that $SiF_4$ would serve to aid in extinguishing, quenching, and preventing restriking of the arc. Regardless of the relative capability of $SiF_4$ as an arc quenching gas, we are persuaded that Cobine's contemplated quenching purpose would have motivated one skilled in the art to improve upon the quenching results actually obtained by Cobine. Use in circuit interrupters of $SF_6$ gas as a quenching medium and of solid materials capable of generating $SF_6$ gas was well known in the art. Appellant admitted at oral argument that the invention resides in placement of the gas generating materials in the electrodes so that the emitted gas will sweep across the path of the arc. Cobine uses the same location for the same purpose. Accordingly, we affirm these rejections.

*Claims 35–41*

■ Appellant argues against the rejection of claim 35 under 35 U.S.C. § 103 on Cobine in view of Farrer on the same basis that he argues for patentability of the limitations found in claims 29, 30, and 32–34. The same considerations set forth above apply to this rejection. Again, appellant has not separately argued the dependent claims and consequently, they fall with independent claim 35. In re Burckel, supra. Appellant asserts that Farrer is not properly combinable with Cobine, but his failure to advance this argument before the board

precludes our consideration. In re Brown, 56 CCPA 1342, 412 F.2d 1407, 162 USPQ 361 (1969). Therefore, we affirm the rejections of claims 35–41.

*Claims 28–42*

■ Appellant argues that the grandparent application was enabling when considered in light of prior art references recognized by both appellant and the PTO to be indicative of the level of ordinary skill in the art and in light of well-known, inherent properties of gases specified in the grandparent application. Consequently, appellant maintains that these claims are entitled to the filing date of the grandparent and parent applications and that the PTO is precluded from applying appellant's British patent '646 and German Auslegeschrift '594 as references. We agree and reverse the rejections of claims 28–42 under 35 U.S.C. § 103 on those references.

■ Regarding appellant's use in the grandparent application of the term *elements,* we agree with the board that he has not expressly disclosed how the nonmetallic *elements,* fluorine, sulphur, or selenium, could be combined with the metallic *elements,* tungsten or molybdenum, to form electrodes capable of generating $SF_6$, $SeF_6$, or $CF_3SF_5$ gas. However, the disclosure in question must be read in light of the knowledge possessed by those skilled in the art, and that knowledge can be established by affidavits of fact composed by an expert, In re Katzschmann, 52 CCPA 1497, 347 F.2d 620, 146 USPQ 66 (1965), and by reference to patents and publications available to the public prior to appellant's filing date, In re Eynde, 480 F.2d 1364, 178 USPQ 470 (Cust. & Pat.App.1973). The affidavit of appellant's expert declares that a person skilled in the art would have recognized that "an interpretation that [use of the term "element" in] the Lange application intended chemically elemental fluorine would be clearly inconsistent with basic chemical principles since fluorine would certainly not be stable in the elemental state on or within the electrodes and contacts of the quenching chamber described in detail in the

Lange application, but rather, would react with adjacent material to form compounds." Further, the affidavit declares that compounds capable of generating the specified gases "would be readily apparent to one skilled in the art," as evidenced by the Mandelcorn reference. Appellant's grandparent application discloses that the metallic and nonmetallic elements may be *superimposed in layers.* Although this technique was known in the prior art, it was accomplished by the use of substances or compounds as evidenced by the Cobine reference, which discloses impregnating the electrodes and glazing surfaces over which the arc passes, and by the Mandelcorn and Biersack references, which disclose coating chamber surfaces with clathrate materials. We are satisfied that a person skilled in the art would readily consider prior uses of clathrate and other materials and, consequently, would substitute the broader terms, substances or compounds, for elements when reading the grandparent's specification.[10]

We further agree with the board that, even substituting the terms substances or compounds for the term elements and utilizing clathrate materials as appellant's expert suggests, appellant has not disclosed how these materials could be cast, melted, decomposed, or sintered to form electrodes capable of generating the specified gases, because clathrate materials, due to their comparatively low melting temperature, would not remain intact during formation of the electrodes under the influence of heat necessary to cast, melt, decompose, or sinter the metallic substances or compounds. As a result, it would appear that a person skilled in the art could not, following the grandparent's disclosure, form electrodes by these processes. However, although appellant can be required to limit his claims to that subject area which is adequately disclosed, the existence of spe-

cies which are not adequately disclosed does not require that the entire application be found nonenabling. *See In re Cook,* 58 CCPA 1049, 439 F.2d 730, 169 USPQ 298 (1971). That is especially true in this case where, as stated by appellant at oral argument, the method of forming the electrodes is not the inventive principle. We agree with the board that a person skilled in the art and familiar with the Mandelcorn disclosure would not be able to cast, melt, decompose, or sinter to form electrodes, but we are satisfied that such a person would be capable of *superimposing* the materials disclosed by Mandelcorn on the electrodes *in layers.* Because neither the board nor the PTO has attempted to rebut this interpretation, appellant has overcome any reasonable basis for doubting the adequacy of the grandparent's disclosure. *See In re Cook, supra.*

Finally, the board states that because the claim limitation "said arc quenching gas having an ultimate dielectric strength of an order of magnitude greater than that of air" is not expressly disclosed in the grandparent application, the claims are not entitled to the grandparent's filing date to overcome the rejection. However, as indicated by the Cobine and Lingal references, this is a well-known, inherent property of $SF_6$ gas. This court has stated:

> By disclosing in a patent application a device that inherently performs a function, operates according to a theory, or has advantage, a patent applicant necessarily discloses that function, theory or advantage even though he says nothing concerning it. The application may later be amended to recite the function, theory or advantage without introducing prohibited new matter.

*In re Smythe,* 480 F.2d 1376, 1384, 178 USPQ 279, 285 (Cust. & Pat.App.1973).

---

10. Appellant does not argue that a mere error in translation has occurred which should be correctable notwithstanding 35 U.S.C. § 132. The German priority document upon which the grandparent application relied used the term "stoffe." When filing the grandparent applica-

tion, appellant translated this term to mean *elements.* However, the PTO in translating the '594 Auslegeschrift which is the published version of the priority document relied on by appellant's grandparent application, translated "stoffe" to mean *substances.*

*Summary*

In view of all the foregoing, the decision of the board affirming the rejections of claims 28, 31, and 42 under 35 U.S.C. § 102 on Cobine and claims 28–42 under 35 U.S.C. § 103 on the '594 and '646 references is *reversed*; the decision of the board affirming the rejections under 35 U.S.C. § 103 of claims 29, 30, and 32–34 on Cobine and claims 35–41 on Cobine in view of Farrer is *affirmed*.

MODIFIED.