32 C.C.P.A. (Patents)

## Application of SMITH.

### Patent Appeal No. 4979.

Court of Customs and Patent Appeals.

March 12, 1945.

Albert J. Kramer, of Washington, D. C., for appellant.

W. W. Cochran, of Washington, D. C. (E. L. Reynolds, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

BLAND, Associate Judge.

This appeal involves a single claim numbered 7, the only claim in appellant's application. It reads:

"7. An insecticide containing as its essential active ingredient substantially pure gamma, gamma-dipyridyl."

As indicated by the claim, the substance is for use in combating insect infestation on vegetation, and it appears that it may be applied in either liquid or dust form.

The applicant appears to be a scientist employed by the United States Department of Agriculture, and the application, filed March 31, 1941, was made under the provisions of law governing patent applications by Government employees.

The examiner rejected the claim as being unpatentable over the disclosure of a publication, issued by the Department of Agriculture in October 1926, entitled "Toxicity of Dipyridyls and Certain Other Organic Compounds as Contact Insecticides." The Board of Appeals affirmed the decision of the examiner and the instant appeal to this court followed.

The publication cited appears to have been prepared by Charles H. Richardson and C. R. Smith, scientists in the employ of the department, and it is hereinafter referred to as the Richardson et al. article. It is identified in the statement of the examiner as appearing in the "Journal of Agriculture Research, Vol. 33, pages 597-609 (1926)."

Neither the examiner nor the board quoted the text of that part of the Richardson et al. article which was regarded as anticipatory. In his statement following the appeal to the board the examiner said:

"The claim is rejected as directly met by the Richardson et al. publication. Richardson et al. teach the use of dipyridyls generally and give specific attention to gamma, gamma-dipyridyl. Applicant urges that this is not a reference as Richardson et al. show that the gamma, gamma-dipyridyl is not as effective as the others, and will, in fact, dilute the toxic effect of the other dipyridyls. This teaches that the concept of using gamma, gamma-dipyridyl as an insecticide is old. It does not necessarily, as applicant urges, show that gamma, gamma-dipyridyl is not useful as an insecticide. It simply shows that gamma, gamma-dipyridyl is not as toxic to the insects tested as the other dipyridyls. In regard to applicant's arguments that he has produced an invention by reversing the teaching of the prior art, attention is directed to In re Colin, 538 O.G. 5."

In the course of its decision the board said:

"The subject matter in issue is an insecticide consisting mainly of gamma, gamma-dipyridyl. The appealed claim stands finally rejected on the publication

cited above. There are six dipyridyls which are fully discussed in the article cited. The authors of this article made a general survey with regard to the use of these isomers as possible insecticides. Judging from the statements made at the bottom of page 599 and at the top of page 609 the gamma, gamma-dipyridyl was not considered as effective an insecticide as the others mentioned.

"It is difficult to see wherein there could be any invention involved in the subsequent discovery that the gamma, gamma-dipyridyl was effective as an insecticide. The reference shows that the substance per se was old and well known and its use as an insecticide was clearly contemplated by the authors of the article. At best all that appellant has done was to discover that under certain conditions not specified in the appealed claim the material would be effective."

In addition to the case of In re Colin, 124 F.2d 219, 29 C.C.P.A., Patents, 757, cited by the examiner, the board also directs attention to the case of In re Thuau, 135 F.2d 344, 30 C.C.P.A., Patents, 979, which was decided by us subsequent to the decision of the examiner in the instant case, but prior to the decision of the board.

As stated in the board's decision, six dipyridyls were discussed in the Richardson et al. article, one of them being the gamma, gamma-dipyridyls.

We have examined the article with much care in the effort to ascertain just what the experiments therein described disclose with respect to gamma, gamma-dipyridyl, and we here quote the statements deemed to be pertinent in this case. In the introduction it is said:

"* * * A previous publication discussed the toxicity of some pyridine derivatives (3)[2] and referred briefly to the compounds which form the subject of the present investigation. It was found in these experiments that impure γγ dipyridyl was much more toxic than the purified substance, and it was later shown that these impurities consisted principally of isomeric dipyridyls. It is the purpose of this paper to report on the toxic value of these dipyridyls as contact insecticides. * * *"

At a later point it is stated:

"Oxidation of sodium dipyridine with moist air results in the formation of γγ dipyridyl, the sodium atom and two hydrogen atoms being removed. Careful regulation of the temperature during the preliminary sodium-pyridine digestion, followed by oxidation (with dry air or oxygen) of the sodium dipyridines thus formed, leads to the production of an oil which contains chiefly "αα, ββ, βγ, and γγ dipyridyls. This crude dipyridyl oil, from which most of the γγ dipyridyl was removed, was used in the experiments described below. * * *"

Under the heading "Preliminary Experiments on the Toxicity of Crude Dipyridyl Oil" appears the following:

"Studies on the toxicity of the dipyridyls as contact insecticides were begun in August, 1920. The first indication of toxic action appeared when a crude mixture, the result of an attempt to produce γγ dipyridyl, was found to be highly toxic to the bean aphis (Aphis rumicis L.) at a concentration of 1 per cent of the mixture.[3] Experiments soon demonstrated that purified γγ dipyridyl was only slightly toxic, if at all, and that the mother liquor separated from it was even more poisonous to insects than the original mixture. * * *"

Under the heading "Methods of Application of Crude Dipyridyl Oil," it is said:

"After a large number of preliminary experiments, a crude dipyridyl oil known to contain a variable mixture of αα, ββ, and βγ, dipyridyls was prepared for the toxicity experiments. * * *"

Under the heading of "Summary" the following statement appears:

"αα, ββ, βγ, and γγ dipyridyls, which occur in the crude dipyridyl oil used in these tests were not so toxic to Aphis rumicis as the crude oil itself; γγ dipyridyl is much less toxic than the other three compounds."

It will be noted that in the said publication which formed the basis of the Patent Office rejection of the claim, it is stated that experiments soon demonstrated that purified gamma, gamma-dipyridyl was only slightly toxic, if at all, and that the mother liquor separated from it was even more poisonous to insects than the original mixture. The publication does not disclose the details, such as the percentage of water and that of pure gamma, gamma-dipyridyl, or the length of time given for it to take effect, or many other possible details which properly could have been set out by the

said Department of Agriculture experimenters.

Agreeable to the Patent Office findings, it is at once apparent that substantially pure gamma, gamma-dipyridyl is not a new substance discovered by applicant, and that he was not the first to use it for the purpose of determining its value in combating insect infestation on vegetation. As was properly said by the board, the most that appellant has done was to discover that under certain conditions, not specified in the appealed claim, the material would be effective. It seems too clear to invite extended discussion that under such circumstances the appellant is not entitled to a patent claim for an insecticide which contains as its essential active ingredient, substantially pure gamma, gamma-dipyridyl.

Appellant sets out in some detail in his specification the conditions under which he used the substantially pure gamma, gamma-dipyridyl in determining its value as an insecticide. For instance, in one experiment he used 2 pounds to 50 gallons of water and obtained a mortality of 25.5 per cent to codling moth larvae. He stated that this was not so good a result as when lead arsenate was used in the same concentration. He discloses, however, that in another experiment he used 8 pounds of material to 100 gallons of water as a spray and obtained 62 per cent mortality on 5th instar southern beet webworm after 6 days, and that when applied as a dust, he obtained a kill of 97 per cent in 48 hours. He also tested the material as a spray against the 5th instar melon worm and obtained 96 per cent kill in 4 days at a concentration of 8 pounds to 100 gallons of water. When applied as a dust, he obtained 96 per cent kill in 72 hours. Other experiments showed that when the material was tested in different concentrations and under different conditions, he obtained splendid results on newly hatched screwworm, Hawaiian beet webworm, and European corn borer.

If appellant has made any invention, it rests in discovering the particular conditions under which substantially pure gamma, gamma-dipyridyl can be used successfully as an insecticide. If he has contributed to the insecticide art, it has been in that respect only. And, if he is entitled to any patent protection for what he has done, the claim or claims of his application should have been drawn to cover that particular alleged advancement in the art.

We do not mean to suggest by the foregoing that had appellant submitted claims, the language of which covered the details of his experiments which brought about the desired result, such claims would be allowable in the instant application. The subject of criticalness would be present; also, the presence or lack of invention in doing what appellant has done would be a matter for serious consideration. But whether or not appellant would be allowed claims which embrace the details of his successful experiments would necessarily involve the question as to whether, in view of the suggestion in the reference, appellant did anything more than to take a substance which was old, and which had been suggested as having in its pure form at least some toxic effect on some insect pests, and from such suggestion make experiments under different conditions until he had discovered a manner of utilizing the material profitably as an insecticide, and whether what he did involved anything more than that which one skilled in the art would ordinarily do.

It is true that appellant, in the instant claim, has not asked for a monopoly on pure gamma, gamma-dipyridyl for all purposes. He of course realizes that he is not the inventor of that material, and he has attempted to limit his proposed monopoly to the use of the material as an insecticide.

In view of our conclusion, we do not feel called upon here to enter into a discussion of the effect to be given to the introductory clause as calling for "an insecticide." We feel certain that under the circumstances above enumerated, appellant is not entitled to a monopoly on substantially pure gamma, gamma-dipyridyl, as an insecticide.

The tribunals below, we think, properly relied upon In re Colin, supra. In that case, the applicant sought a patent on a mineral oil composition in which was incorporated an alkoxy-substituted aryl amine. The amine was old, and its utility had been tried in the same connection by others, who had reported their findings in an article in the publication Industrial & Engineering Chemistry. That was regarded by this court as a proper reference in denying the claims. The reference there taught that the use of the material was harmful rather than helpful, or at least that

there were no beneficial results flowing from its use. In that case the applicant experimented and found that under certain conditions the material had utility. The reference article had suggested that a different result might be obtained under different conditions. This court held that the applicant was not entitled to a patent "on a composition or a process based upon its use merely because, by experimentation at certain temperatures and under certain conditions, he has found that the substance rejected by the prior art has utility, when the claims presented contain no definite percentage of inhibitors or any other limitations or elements which lend patentability." [124 F.2d 221.] The court further said: "If appellant, by using panisidine in a certain critical percentage or at critical temperatures or under other critical conditions has discovered why Mead et al. [the authors of the reference article] had not found the material beneficial, his invention, if any, would rest in such discovery, *and these critical conditions which brought about the useful results should be presented in the claims.*" [Italics not quoted.]

It seems to us that that case is squarely in point, and the mere fact that appellant, in his specification, recites the conditions under which the experiments were made does not change the situation, because, after all, the claims of a patent should be the measure of the patent monopoly granted thereunder.

The case of In re Thuau, supra—particularly certain language used therein—we think also supports the conclusion we have herein reached.

The decision of the Board of Appeals is affirmed.

Affirmed.

GARRETT, Presiding Judge (dissenting).

The rejection of the single claim here involved by the respective tribunals of the Patent Office was predicated solely upon the Richardson et al. article, from which the majority quotes all matter that seems in any wise pertinent here.

I have been unable to divest myself of the impression that the Richardson et al. article, fairly construed, teaches those skilled in the art (to say nothing of the unskilled), that substantially pure gamma, gamma-dipyridyl, has no practical value as an insecticide, even though it may have been found to possess some slight toxic qualities. I note particularly the statement in the third excerpt quoted from the article, reading:

"Experiments soon demonstrated that purified $\gamma\gamma$ dipyridyl was only slightly toxic, *if at all* * * *." (Italics mine.)

It may be conceded—indeed it is apparent—that purified gamma, gamma-dipyridyl, was tested in certain of the experiments recited in the reference, because it is clear from the above, and from other of the excerpts quoted in the majority opinion, that it was compared with other substances respecting its toxic effect, but it is the teaching of the result obtained which I conceive to be of moment here.

Had the public accepted, without question, the teaching of the article, it seems certain that no "substantially pure gamma, gamma-dipyridyl," ever would have been developed as an insecticide. Appellant here did not accept it, but investigated further and discovered its usefulness. The last of his experiments described in the majority opinion, in particular, indicates a very high toxic value in the insecticide field, which, it seems to me, is directly contrary to the teaching of the Richardson et al. article under a fair and normal construction of the quoted excerpts taken altogether.

I do not regard the decision in the case of In re Colin, 29 C.C.P.A. (Patents) 757, 124 F.2d 219, cited below and by the majority here, as controlling in this case. In that case it was found by the examiner that in the publication which constituted the reference in that case, the authors "cautioned the reader that under a different set of conditions a different result might be obtained." That, I thought, was an invitation—indeed a suggestion—to make further investigations relative to the practical utility of the product described in the publication. We have no such invitation or suggestion here. I do not regard the Thuau case, cited by the majority, as controlling, but there is no reason for discussing it in a dissenting opinion.

I must frankly say that I think it would have been well had appellant here couched his claim in somewhat different language, or included an additional claim more limited than the one presented, but there is no question in my mind that his specification discloses matter which supports the claim as written. Were it granted, it, of course,

would be measured by the specification in any test of its validity.

Believing the claim to be properly allowable, I respectfully dissent.