David LEINOFF, Appellee,

v.

LOUIS MILONA & SONS, INC.,
Appellant.

Appeal No. 83–814.

United States Court of Appeals,
Federal Circuit.

Jan. 24, 1984.

---

Michael J. Sweedler, New York City, argued, for appellant. With him on brief, was Terry J. Ilardi, New York City.

Pasquale A. Razzano, New York City, argued, for appellee.

Before KASHIWA, Circuit Judge, NICHOLS,* Senior Circuit Judge, and NIES, Circuit Judge.

NICHOLS, Senior Circuit Judge.

This appeal is from a final judgment of the United States District Court for the Southern District of New York, holding United States Patent No. 3,760,424 valid, 556 F.Supp. 273, 219 USPQ 1186 (S.D.N.Y. 1982), and infringed and awarding treble damages, 556 F.Supp. 280 (S.D.N.Y.1983). We *affirm in part, reverse in part, vacate in part,* and *remand.*

### Background

David Leinoff ("Leinoff"), the plaintiff-appellee, is the sole owner of a fur manufacturing and selling company, David Leinoff, Inc. He brings this action in his capacity as the owner of the patent in suit, U.S. Patent No. 3,760,424 ("the Leinoff patent," "the '424 patent") issued September 25, 1973. Leinoff is also the named inventor of the '424 patent, which is directed toward a composite fur pelt and the method for making the same. Louis Milona and Sons, Inc. ("Milona"), the defendant-appellant, is a New York corporation which manufactures and sells fur coats. Leinoff and Milona compete in the wholesale and retail fur coat business.

The invention relates to producing unique design effects in fur coats. An object is to create an "attractive stripe effect" in such coats, and to broaden the range of use of long-haired furs. One step of the patented method involves a technique commonly known to fur manufacturers as "leathering." Leathering involves inserting leather strips of a specified width in relation to the hairs of an animal pelt between cut strips of the animal pelt laid in a position unchanged from their ordinary relative positions in the uncut pelt. The use of this composite method causes a fur to look much longer and flatter than a fur in its natural state. Long-haired pelts, such as badger, were not ordinarily used in the manufacture of coats prior to leathering because they were considered relatively bulky.

Certain long-haired fur pelts are characteristically comprised of hairs which are light colored at the base, or "underground," and darker at the tip portion. (Some pelts, such as badger, may also have small portions of white at the extreme ends of the dark tip portions.) The underground portion is somewhat "wooly" in nature and is not generally visible in pelts in their natural state. Leinoff connects the fur strips and leather connector strips in such a way as to overlap the dark tips of the pelt hair and the lighter portion of the underground. In exposing the underground, Leinoff creates his composite pelt with a striped effect.

Leinoff wrote to Milona on January 8, 1974, informing Milona of the existence of the '424 patent and offering it a license. Milona ignored the letter and continued to manufacture coats using the allegedly infringing method. Leinoff did not approach Milona again about the '424 patent until December 9, 1980. In the intervening

---

* Judge Nichols assumed senior status effective October 1, 1983.

years, Leinoff instituted litigation in which the '424 patent was held valid. *Leinoff v. Valerie Furs, Ltd.,* 501 F.Supp. 720, 210 USPQ 885 (S.D.N.Y.1980).

Leinoff filed the present action on February 25, 1981. The issues of validity and infringement were bifurcated for trial. The court held the patent valid and infringed and awarded treble damages.

## Opinion

### A. Validity

The trial court recognized that since a statutory presumption of patent validity exists, 35 U.S.C. § 282, Milona bore the burden of establishing the patent's invalidity. To meet this burden, the court required that Milona establish not that it presented art materially different from that which the patent examiner cited when reviewing the patent application, but rather, that it presented art more pertinent than that which the court (in this case, the same judge) considered in *Valerie Furs.* The court found the new prior art which Milona introduced not materially different from art it had considered earlier and therefore insufficiently persuasive to rebut the presumption of validity. We have considered all prior art presented in either case, though *Valerie Furs* is not directly before us for appellate review.

■ Milona argues now that the court erred in applying any statutory presumption of validity to the '424 patent. Milona contends, it appears, that whenever the prior art that the alleged infringer introduces is more pertinent than that considered by the United States Patent and Trademark Office ("PTO"), the trial court should perform a *de novo* review of the facts underlying the question of obviousness, free of the presumption. Contrary to this contention, however, the introduction of prior art more pertinent than that which the examiner considers does not weaken or destroy the statutory presumption of validity. *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534, 218 USPQ 871, 875–76 (Fed.Cir.1983). Rather, where new pertinent art is introduced, the patent owner can, and often

should, make a countervailing argument in support of validity; the more persuasive the opposer's prior art, the more convincing any rebuttal argument ought to be. *See, e.g., American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350 (Fed.Cir.1984). Regardless of the prior art Milona introduced in evidence at trial, therefore, the presumption of validity remains intact.

### 1. Section 102 defense

Milona argues that the '424 patent is invalid for lack of novelty under 35 U.S.C. § 102. The district court found, however, that none of the eight prior art publications upon which Milona relied disclose all of the elements of the Leinoff claims in the identical fashion. In reaching this finding, the court followed the rule that "[t]o anticipate a claim, a prior art reference must show each and every element claimed." *General Electric v. United States,* 572 F.2d 745, 768, 215 Ct.Cl. 636, 198 USPQ 65, 85 (1978); *In re Royka,* 490 F.2d 981, 984, 180 USPQ 580, 583 (CCPA 1974).

Milona focuses on two references in its argument new to us. The German-language textbook, H. Schirmer, *Die Technik Der Kuerschnerei* (1928), states that "Japanese" badger may be leathered to lengthen a fur pelt. This reference is important, Milona tells us, because it contradicts Leinoff's statements that he was the first to leather badger and thus first to extend the use of this bulky fur to the manufacture of fur coats. The district court, however, noted the inability of Milona's expert to compare Japanese badger with American badger, to state what the coloration of a Japanese badger's hairs are, or to state whether the use of Japanese badger would produce a noticeable striped effect on the fur side of the pelt. This reference, alone, therefore, anticipates nothing but the well-known concept of "leathering."

Milona relies, in addition, on *Rauchwarenherstellung und Pelzkonfektion* 335–337 (VEB Fachbuchuerlag 1970). This German-language reference discloses a "gallooning" technique which can be used for "achieving fashion effects." (Gallooning is the equiva-

lent of leathering.) The trial court found, however, that this reference, the most relevant one Milona cited, failed to produce or suggest producing the striped effect of the Leinoff invention.

Milona also placed in evidence a pelt with stripes which it allegedly made in accordance with the *Rauchwarenherstellung* reference's teaching. The evidence shows, however, and the district court so found, that Milona's witness could not and did not make this pelt according to the reference. The reference clearly states, specifically, that the undercoat "is not to be separated while cutting, sewing and tacking, * * *." That is, the hairs over the cut are to remain intermingled and held together by the wooly underground while the leather is sewn in. If the undercoat is not separated, however, the underground cannot be exposed and no striped effect can be produced. The *Rauchwarenherstellung* reference, therefore, does not anticipate the Leinoff invention.

■ We have examined not only the two references upon which Milona particularly relies here, but all other references shown to the trial court as well. Milona has not convinced us that the trial court made any clearly erroneous findings as to anticipation. We disagree with the dissent's analysis, which takes the Schirmer reference, substitutes American badger fur for the Japanese badger fur for which Schirmer calls (a substitution, incidentally, which the district court found lacked a sufficient basis), separates the strips of this fur according to other references which indicate that some furs may have their fur strips physically separated, and then argues that all the elements or steps of the claimed invention are disclosed in one anticipatory reference. The '424 patent is not invalid under 35 U.S.C. § 102.

### 2. *Section 103 defense*

Milona next argues that the district court erred in not finding the invention claimed in the '424 patent obvious and the patent invalid under 35 U.S.C. § 103. The now well-established test for obviousness, which the district court carefully followed, requires resolution of at least three fact questions: "the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966).

Milona and Leinoff agree that the claims in issue differ from the prior art in that the claims state that the inserted leather strips "expose said light portions of the pelt hairs and produce a striped effect." The dispute here lies in whether the method for creating this striped effect, when viewed as a whole in light of the prior art, is an unobvious invention.

Milona showed the district court several publications which, it argued, showed the obviousness of the Leinoff invention. The court found, however, that the references taught nothing more than that people have leathered long-haired furs in the past. The prior art references do not teach, that is, that one can use leathering to create a material alteration, such as Leinoff's striped effect, in the appearance of the fur.

■ The question of obviousness depends, furthermore, on "not only what the references expressly teach, but what they would collectively suggest to one of ordinary skill in the art." *In re Simon,* 461 F.2d 1387, 1390, 59 CCPA 1140, 174 USPQ 114, 116 (1972). The district court found that leathering was commonly known in the art of fur manufacture. It also found, however, that one of ordinary skill knew how to use leathering methods solely for lengthening or widening fur. That is, "[a]t the time of the Leinoff invention, the entire cast of the furrier trade was to maintain in the product the natural appearance of the fur of the respective animals. Nowhere was there a method for altering the natural appearance of the fur surface to produce a repetitive, 'artificial' design." 556 F.Supp. at 278, 219 USPQ at 1190, *quoting Valerie Furs,* 501 F.Supp. at 726, 210 USPQ at 840.

Milona disputes this finding, arguing that at least one publication, *Rauchwarenherstellung und Pelzkonfektion,* teaches that one can "galloon" for "achieving fashion effects." Milona further argues that whether or not the art sought to maintain the furs' natural appearance is utterly irrelevant. Rather, Milona states, the change now from a natural appearance to a striped effect is made strictly for fashion purposes. Milona relies on its belief that fur coat manufacturers and retailers did not have a long felt need for a striped fur. In Milona's view, any skilled furrier who *wanted* a striped effect could have developed one based on the prior art.

■ Milona's argument suffers from a fatal flaw, however. In particular, long felt need is not a *requirement* for nonobviousness. The so-called secondary considerations set forth in *Graham v. John Deere Co., supra,* are simply indicia of nonobviousness. These considerations permit a tribunal to consider, as relevant to an alleged invention's nonobviousness, evidence of commercial success, immediate copying by others, and long felt but unmet need. Although this evidence often helps a tribunal determine an invention's nonobviousness, it is not necessarily conclusive.

Further, it is not enough for Milona to say that furriers before Leinoff could have created a striped effect had they desired, and abstained only because they saw no need for such an effect. Although a patent should issue only for new and nonobvious inventions, there is no requirement that persons of ordinary skill have been aware of the problem, or have been seeking solutions. The inventor is not required to have been the winner of a race to a common goal. Certainly, an invention may create a new want and still be nonobvious and therefore patentable. Leinoff invented here a new method for producing a striped effect in fur coats. That Leinoff's coats became fashionable and that Leinoff successfully marketed his coat does not, and cannot, detract from his invention's patentability.

The position of the dissent is, as we understand it, that the prior art knew how to *avoid* showing unnatural stripes, while using the leathering technique to extend the fur, and that one who knows how to *avoid* a result, necessarily knows how to *achieve* it. He would achieve it, one supposes, just by not avoiding it. Of course, one who looks at the natural badger, or any other fur having hair of different shades at each hair's two extremities, will not see stripes. They are not "suggested" by the natural fur. That one who desired stripes would derive the suggestion from knowledge of leathering or gallooning, is superficially plausible, but is contrary to fact findings within the trial judge's province to make.

■ After reviewing the evidence in the record and summarized above, we are unable to find reversible error in the trial court's holding that Leinoff's "result, although it may appear simple in hindsight, is sufficiently unexpected, given the prior state of the art, to merit patentability," 556 F.Supp. at 278, 219 USPQ at 1196, *quoting* 501 F.Supp. at 726–27, 210 USPQ at 841, and that the invention would not have been obvious within the meaning of 35 U.S.C. § 103. (We note, in conclusion, that the trial court, which, after making its *Graham* determination of nonobviousness, considered whether a "synergistic" result existed, merely made a "gratuitous reference to 'synergism' [which] did not here detract from the determination of obviousness made in accord with accepted standards," *Chore-Time Equipment, Inc. v. Cumberland Corp.,* 713 F.2d 774, 781, 218 USPQ 673, 677 (Fed.Cir.1983). We hold that this is harmless error.)

## B. *Infringement*

The district court found that all of Milona's badger coats, its "feathered" natural blue fox coats, and its "feathered" vin rose blue fox coats infringed the '424 patent. It found, however, that Milona's stone marten and raccoon coats did not infringe the patent.

■ Milona challenges the trial court's finding of infringement on two grounds. First, Milona argues that its badger coats

cannot infringe the '424 patent since the patent claims require tip portions of the animal fur to be *dark* whereas Milona's coats have *light* tips. We cannot agree. The trial court concluded, after hearing the testimony of several experts, that the presence of a variation where badger pelt hairs have light tips is a matter which a skilled furrier would know and understand. Furthermore, Leinoff's claim 8 expressly recites language encompassing badger fur coats.

Milona's second contention is that its accused coat does not infringe, since Leinoff's claim 5 requires that the width dimension of the leather strips "be greater than the length of the dark tip portions of the pelt hair," which here are approximately one centimeter long. The width dimension of the leather strips in the accused coat ranges between .898 and 1.106 centimeters. Since the width dimension of the leather varies so much, Milona claims, the width of the leather connector strips cannot be of primary importance in creating the striped effect. The trial court found, however, that the significance of the leather strips in Leinoff's process is their insertion in such a manner as to displace the dark tips a sufficient distance to expose the inner light portions, or underground of the fur. The court further found that it was the average of the dark tip portions which is significant and that the variation of two-tenths of a centimeter in the width of the leather strips is not realistically likely to change the overall effect, particularly in view of the fact that each hair of each pelt is certain to vary somewhat. Milona has not persuaded us that the district court's findings are clearly erroneous as to the issue of infringement.

## C. *Laches*

The only statutory time limitation on a patent infringement action is set forth in 35 U.S.C. § 286, which provides that one cannot recover damages for any infringement committed more than 6 years before the filing of a complaint. This limitation only restricts the extent one can recover *pre-filing* damages. It places no other limitation on the filing of an infringement action during a patent's 17-year term.

Since there is no statute from which to determine the timeliness of an infringement action, vis-a-vis the patentee's first knowledge of infringement, courts use the equitable doctrine of laches. The parties here have not referred us to, nor can we find, any case in which our predecessor courts have applied the doctrine of laches in a patent infringement action. Our predecessors have, however, in another context clearly given recognition and effect to the doctrine itself. *See, e.g., Brundage v. United States,* 504 F.2d 1382, 1384, 205 Ct.Cl. 502 (1974), *cert. denied,* 421 U.S. 998, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975). The law is well settled that in order to assert the defense of laches, the defendant must prove two essential elements: (1) unreasonable and inexcusable delay in the assertion of the claim; and (2) material prejudice to the defendant resulting from this delay, but the longer the delay, the less need there is to show specific prejudice. *Id.*

Laches, if proven, does not preclude a patent infringement action. It has, for example, no effect on an action for *post-filing* damages or an injunction. It simply bars the recovery of *all pre-filing* damages.

The one asserting a laches defense normally must prove the unreasonableness of a delay in filing the suit. The unreasonableness of a delay, of course, depends on the particular circumstances of the case and is left as a matter to the trial court's discretion. Normal equity practice, however, considers the passage of time equivalent to a comparable statute of limitations presumptive of laches. *See, e.g.,* Note, *Developments in the Law—Statutes of Limitations,* 63 Harv.L.Rev. 1177, 1184 (1950). Because of the 6-year limitation in section 286, therefore, a 6-year delay is presumptively an unreasonable one for filing a patent infringement suit. *See e.g., Studiengesellschaft Kohle v. Eastman Kodak Co.,* 616 F.2d 1315, 206 USPQ 577 (5th Cir.1980).

The fact that a case is brought more than 6 years after infringement is

noticed is not, in itself, enough to preclude a recovery of pre-filing damages. The patent owner may have an adequate excuse for the delay. The result of the presumption after 6 years shifts the burden, however, to the patent owner now to prove the existence and reasonableness of such an excuse.

A delay exceeding 6 years is, furthermore, presumptively injurious to the infringer. The infringer does not need, in such a case, to produce any additional evidence of prejudice. *See, e.g., Studiengesellschaft, supra* 616 F.2d at 1326, 206 USPQ at 587; *TWM Manufacturing Co., Inc. v. Dura Corp.*, 592 F.2d 346, 349, 201 USPQ 433, 435 (6th Cir.1979). The patent owner, therefore, bears the additional burden of showing lack of injury to the infringer caused by the delay.

In the present case, Leinoff sent a letter to Milona on January 8, 1974, demanding Milona cease infringing its patent and offering Milona a license. Leinoff did not further communicate with Milona until December 9, 1980, when Leinoff again offered a license to Milona. Leinoff filed the present infringement action on February 25, 1981. Since Leinoff waited more than 6 years after its first contact with Milona to file this action, the burden of showing inexcusable and unreasonable delay and material prejudice is no longer upon Milona. Leinoff, instead, must justify his delay. The district court was under the erroneous impression that the shift in the burden was applicable only to infringements more than 6 years before the action was brought, of which none were shown. The issue is not that easy to resolve. Milona is entitled to an informed and reasoned assessment of the equities of the case. We therefore vacate the district court's judgment as to Milona's laches defense.

We do not believe the facts are so clear and convincing in this case as to merit our reaching a final decision on the issue of laches, however. We shall remand this part of the action, therefore, to the trial court for a determination of the laches defense with the burden of proof properly assigned.

We note in passing that Leinoff relies on his activity in pursuing other infringers in other infringement suits to justify his delay here. Whether intervening litigation is an adequate excuse, and, if it is, what notice that the infringement is not condoned is necessary, has never been settled by this court or its predecessors. Other circuit courts, furthermore, have produced conflicting decisions on this issue. *Compare Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d 1315, 206 USPQ 577 (5th Cir. 1980) *with TWM Manufacturing Co., Inc. v. Dura Corp.*, 592 F.2d 346, 201 USPQ 433 (6th Cir.1979) and *Baker Manufacturing Co. v. Whitewater Manufacturing Co.*, 430 F.2d 1008, 166 USPQ 463, (7th Cir.1970), *cert. denied*, 401 U.S. 956, 91 S.Ct. 978, 28 L.Ed.2d 240 (1971). It may well be, though we do not now so hold, that suit on one or more test cases, instead of suing every known infringer, was reasonable in light of the high cost of patent litigation and the comparatively moderate amounts recoverable by our patentee per infringer, and if the infringers understood there was no intent to condone their infringements. This kind of justification for delay in suing is considered in cases we cite, and in those they cite. The award of treble damages, which we consider *infra*, may well reflect a view on the part of the trial court that Milona knew it was doing wrong. It implies a view on the judge's part that Milona has hands that are too unclean to invoke an equitable defense. Since the parties did not address this particular issue in their briefs to us, and findings were not made as to much we deem pertinent, we decline the opportunity to decide it now, and believe that justice requires us to await the views°and findings of the able trial court as to this issue.

D. *Damages and Interest*

The trial court may award increased damages, in its discretion, upon proof of willful and wanton infringement. The willfulness of infringement is a question of fact. Milona must persuade us, therefore, of clear error in the district court's finding. This, however, Milona has

failed to do, except so far as the laches issue subsumes it or may do so.

■ The trial court found that Milona "showed no concern for whether plaintiff had a patent, what rights it granted plaintiff, or whether defendant was infringing those rights until plaintiff sued." *Leinoff,* 556 F.Supp. at 283. Milona knew of the Leinoff patent as early as 1974 when Leinoff offered Milona a license. Instead of studying the patent or consulting patent counsel, Milona simply ignored the letter. Milona also failed to respond to a second letter sent in 1980 informing Milona of the *Valerie Furs* decision. Only after Leinoff filed suit did Milona cease its sale of the infringing coats. On the evidence in the records, we cannot say the trial court clearly erred in its finding.

■ Milona also challenges the award of interest on the damages. Prejudgment interest should ordinarily be awarded absent some justification for withholding such an award. *General Motors Corp. v. Devex,* —— U.S. ——, 103 S.Ct. 2058, 76 L.Ed.2d 211, 217 USPQ 1185, 1189 (1983). It is not an abuse of discretion here, therefore, for the court to compensate Leinoff for the lost use of the money representing the royalty Milona has not paid.

■ This court has recently held, however, that "prejudgment interest can only be applied to the primary or actual damage portion and not to the punitive or enhanced portion." *Underwater Devices, Inc. v. Morrison-Knudsen Co., Inc.,* 717 F.2d 1380, 219 USPQ 569 (Fed.Cir.1983). We therefore reverse the district court's award of prejudgment interest on the punitive portion of the damage award.

*Conclusion*

Accordingly, we affirm the district court's conclusions regarding the validity and infringement of the Leinoff patent and its award of treble damages. We vacate the court's judgment as to the laches defense and remand for further proceedings as to laches with the burden of proof properly assigned. Finally, we reverse the award of prejudgment interest on the punitive portion of the damage award. The final judgment awarding money is vacated, and a new one must await the conclusions of the district court as to laches, all other issues being settled by this opinion. Each party to bear its own costs.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.

NIES, Circuit Judge, dissenting-in-part.

I respectfully dissent from the majority opinion and would hold the product claims 1 and 3 and process claims 5 and 8 of the '424 patent invalid under 35 U.S.C. § 102 and all claims obvious under 35 U.S.C. § 103. The claims appear in the attached appendix.

I

A number of prior references show or describe the identical method of insertion of leather strips diagonally into a fur pelt utilized by the inventor. Indeed, the district court specifically found that "leathering" (which encompasses a variety of techniques, not merely diagonal insertion of leather of uniform width) was "well known in the furrier trade." A comparison of the drawing in '424 with a drawing in the Schirmer reference illustrates the identity of Leinoff's method with the prior art:

'424

Schirmer

The court, nevertheless, found Leinoff's method patentable over the prior art because of the limitation in the subject claim that the leather strips, when inserted, "expose said light portions of the pelt hairs and produce a striped effect."

The district court and the majority are correct in that an anticipatory reference within the meaning of § 102 must disclose all elements or steps of the claimed invention. However, to be anticipatory, a reference need not expressly disclose what is inherent. As stated in *In re Swinehart*, 439 F.2d 210, 212–13, 58 CCPA 1027, 169 USPQ 226, 229 (1971):

[I]t is elementary that the mere recitation of a newly discovered function or property, inherently possessed by things in the prior art, does not cause a claim drawn to those things to distinguish over the prior art.

In this case, the prior art discloses Leinoff's method of leathering. What is not expressly stated in the prior art reference is the result, i.e., leathering so as to produce a striped effect from the natural coloration of the fur. However, as the inventor Leinoff himself admitted, this is inherent when certain types of furs are leathered on the diagonal. His testimony is unequivocal:

Q. In your opinion, Mr. Leinoff, would it be fair to say in the case of at least some badger pelts, if it was leathered on the diagonal with close to the minimum width tape commercially

available, that you would get some striped effect?

A. On some badgers, yes.

Appellant's exhibit of a leathered badger pelt, the front and back sides of which are shown below, confirms this admission, if more proof is necessary:

 

A comparison with Schirmer shows that the above exhibit duplicates the leather insertions shown in the Schirmer diagram and results in a striped pelt. Moreover, the testimony is uncontradicted that leathering strips are commercially available in standard sizes and that the exhibit was prepared with minimum width strips. The majority apparently discounts Schirmer because it deals with "Japanese" badger. However, another prior art reference, Kaplan, also recommends that badger be leathered, with

no restriction as to type of badger, but "Japanese" badger is included as one type of badger with variegated colored hair.

In any event, the trial judge rejected this exhibit, not because it was "Japanese" badger, but because a later reference, *Rauchwarenherstellung und Pelzkonfektion,* stated that, in one of the leathering techniques described therein, the "undercoat is not to be separated." The earlier Schirmer reference is silent as to whether the fur strips are separated, that is, pulled apart to such an extent that the lighter underhair is revealed thereby causing the stripes. On the other hand, the prior art, Post U.S. Patent No. 2,558,279 and Schatz U.S. Patent No. 2,196,273, and, indeed, the *Rauchwarenherstellung und Pelzkonfektion* reference, discloses leathering techniques where fur strips are physically separated, as the court itself noted. Thus, the record shows that separation can occur in "leathering" and that the court's conclusion that the subject exhibit could not have been made in accordance with the prior art because the fur strips were separated is clearly erroneous. The record clearly establishes that anyone who performs leathering on badger using one of the conventional techniques must, in doing so, produce a striped pelt. Striping naturally flows from practicing the known method. As stated in 1 P. Rosenberg, *Patent Law Fundamentals* § 7.02 (2d Ed.1983):

> It is axiomatic that one who performs the steps of a process must, in so doing, necessarily produce all its advantages, for these naturally flow from it and, indeed, are an inseparable part of it. To grant a patent for the mere recognition of even a previously wholly unknown advantage would involve the removal of the physical means needed to produce that advantage from the public domain. Mere recitation of a newly discovered function or property that is inherently possessed by things in the prior art does not cause a claim drawn to those things to distinguish over the prior art.[15]

[15] *General Elec. Co. v. Incandescent Lamp Co.,* 326 U.S. 242, 248–49 [66 S.Ct. 81, 83–84, 90 L.Ed. 43], 67 U.S.P.Q. 155, 157–58 (1945); *In re Oelrich,* 666 F.2d 578, 581, 212 U.S.P.Q. 323, 326 (C.C.P.A.1981); *In re Lange,* 644 F.2d 856, 864, 209 U.S.P.Q. 288, 295 (C.C.P.A.1981); *In re Best,* 562 F.2d 1252, 1254, 195 U.S.P.Q. 430, 433 (C.C.P.A.1977); *In re Smythe,* 480 F.2d 1376, 1384, 178 U.S.P.Q. 279, 285 (C.C.P.A.1973); *In re Swinehart,* 439 F.2d 210, 212–13 [58 CCPA 1027], 169 U.S.P.Q. 226, 229 (C.C.P.A.1971).

Thus, even if Leinoff discovered that leathering, where the cut fur was separated, caused the advantage of stripes in pelts of variegated colored hair, that discovery does not cause the claimed method to distinguish from the prior art teaching of leathering with separation. However, as discussed *infra,* in this case the "advantage" was not even unknown but rather was not considered an "advantage."

Thus, Leinoff's method claim 5 which encompasses leathering all long-haired variegated colored fur pelts and method claim 8 which is limited to leathering badger (a type of that kind of pelt) are fully anticipated because striping is inherent in a known process as applied to at least some types of badger.

By the same token, product claims 1 and 3 are anticipated.[1] As Leinoff admitted: "There is nothing new in the technology of putting pelts together [to make a coat] and leather into the pelts."

II

I would further hold that all of appellee's method claims 5–8 for making a striped pelt would have been obvious to one of ordinary skill in the furrier art.

As noted, the trial court held that the only material difference between the prior art and the claimed subject matter is that the leather strips are inserted so as to produce a striped effect.

Again, turning to the testimony of the inventor, Mr. Leinoff admits that skilled furriers had, for many years, purposely spaced the fur strips at a distance sufficient to avoid exposing the lighter portion of the

---

1. Appellee does not argue that a striped coat or pelt is novel apart from the claimed method.

underground. His testimony on this point specifically was:

> The leather does not show unless, of course, if you raised the fur, and we have come out with the shingle effect, *plus the striping effect. which you see here, which is something that all furriers have been trying to avoid up until this time.* Because the whole thinking of fur has been how not to disturb the surface of the fur, how to make it look like it wasn't disturbed.
>
> Here we unequivocally put leather in for the purpose of creating a striped effect. [Emphasis added.]

While other experts also testified that the usual objective was to maintain the natural appearance of the fur, *Rauchwarenherstellung* also speaks of using leathering for the purpose of "achieving fashion effects" by "interrupt[ing] the profile effect of the fur cross-section." In a sense the prior art *primarily* provides a negative teaching but a negative teaching is, nevertheless, a teaching to one of ordinary skill in the art. *In re Boe,* 355 F.2d 961, 965, 53 CCPA 1079, 148 USPQ 507, 510 (1966); *In re Smith,* 148 F.2d 351, 353–54, 32 CCPA 959, 65 USPQ 167, 170 (1945). Thus, the solution to the problem of creating a striped effect *if desired* would not have been even a modest challenge to a person of ordinary skill as a furrier. It would have been obvious.

Since the technique would have been obvious, Milona argues that others avoided the striped effect only because the product was considered unattractive or unfashionable. This conclusion, in my view, comports with the trial court's statement, "[T]he entire cast of the furrier trade was to maintain in the product the natural appearance of the fur." Thus, the situation here is analogous to that in *Orthopedic Equipment Co. v. United States,* 702 F.2d 1005, 217 USPQ 193 (Fed.Cir.1983), in which this court stated:

> In other words, the fact that the two disclosed apparatus would not be com-

bined by businessmen for economic reasons is not the same as saying that it could not be done because skilled persons in the art felt that there was some technological incompatibility that prevents their combination. Only the latter fact is telling on the issue of non-obviousness. 702 F.2d at 1013, 217 USPQ at 200.

Similarly here, if a striped pattern was not created before by leathering long-haired variegated color fur, it was not because of any technological difficulty to one skilled in the art. Further, if striped long-haired coats are now saleable because of a change in taste fostered by Leinoff, the creation of this "new want" cannot turn an obvious technique, or the product produced through that technique described in claims 1–4, into a patentable invention.[2]

Moreover, while Mr. Leinoff has enjoyed at least modest commercial success with his striped coats, the record does not establish that the basis for his success is due to a particular method of making a coat. Such success could as likely be due to successful merchandising or to the current popularity of long-haired fur garments in general.

As a final matter, I do not find it necessary to overturn any fact finding by the trial court underlying the issue of obviousness. It is the court's legal conclusion that is in error.

### III

For the foregoing reasons, I would reverse the decision of the district court on the issue of validity.

### APPENDIX

*Claims of Leinoff Patent No. 3,760,424*

1. As an article of manufacture, a composite pelt formed of fur strips cut from a long haired pelt in which the tip portions of the pelt hairs are dark and the remainder of the hairs, between the skin and the dark tips, is light; and connector strips opera-

---

2. No argument is made that any claims are patentable if independent claims 1 and 5 fall. Accordingly, there is no need to discuss the prior art which shows the particular limitations in each claim.

tively connected to and alternated with said first strips whereby each connector strip is positioned between two fur strips with said connector strips having a width dimension between adjacent fur strips selected to be greater than the length of the dark tip portions of the pelt hairs and less than the length of the pelt hairs, whereby the pelt hairs on said fur strips extend across adjacent connector strips with the dark tips of the pelt hairs overlying the light portions of the pelt hairs on the next fur strip, thereby to expose said light portions of the pelt hairs and produce a striped effect.

2. An article of manufacture as described in claim 1 wherein the angle between the side edges of said connector strip and the general direction of the pelt hairs is of the order of 45°.

3. An article of manufacture as described in claim 2 wherein said connector strips are of leather.

4. An article of manufacture as described in claim 3 which includes additional composite pelts described and formed into a fur coat or the like.

5. The method of producing fur coats and the like from long haired fur pelts in which the tip portions of the pelt hairs are dark and the remainder of the hairs, between the skin and the dark tips is light, which method comprises, the steps of cutting a pelt into fur strips of substantially the same width at a substantial angle to the general direction in which the pelt hairs normally repose, maintaining said fur strips in their normal relative positions, inserting an insert strip of substantially uniform width between each fur strip and the next, the width dimension of said insert strips being selected to be greater than the length of the dark tip portions of the pelt hairs and less than the length of the pelt hairs, attaching the adjacent edges of the fur strips and the adjacent insert strips to produce a composite pelt which is longer and wider than the original pelt and in which the hair from each fur strip normally reposes across one of the next adjacent insert strips at an angle to its longitudinal dimension whereby the pelt hairs on said fur strips extend across adjacent insert strips with the dark tips of the pelt hairs overlying the light portions of the pelt hairs on the next fur strip, thereby to expose said light portions of the pelt hairs and produce a striped effect.

6. The method as described in claim 5 which includes the additional steps of producing a plurality of additional composite pelts by repeating the above steps, and assembling the composite pelts into a coat or the like.

7. The method as described in claim 5 wherein the fur strips are held together after the first step by an uncut edge portion of the original pelt.

8. The method as described in claim 5 wherein the pelt is a badger pelt.