**PRATT & WHITNEY CANADA, INC., Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. 111–84C.**

United States Claims Court.

July 31, 1989.

See also: 14 Cl.Ct. 268.

Robert Neuner, New York City, attorney of record, for plaintiff; Arthur S. Tenser, John D. Murnane, Brumbaugh, Graves, Do-nohue & Raymond, New York City, Robert C. Walker, and Russell M. Lipes, of counsel.

Jeffrey H. Nelson with whom was Asst. Atty. Gen. John R. Bolton, for defendant; Vito J. DiPietro, Washington, D.C., Director, John Fargo, and Michael J. Fink, of counsel.

## OPINION AND ORDER

NAPIER, Judge:

This is an action brought under 28 U.S.C. § 1498(a) (1982) by Pratt & Whitney Canada, Inc. ("PWC"), against the United States of America. PWC instituted suit on March 5, 1984, seeking to recover compensation for the alleged unauthorized use by the Government of the subject matter claim in United States Patent No. 3,333,762 ("Vrana patent").

In its complaint, PWC asserted claims 1–8 and 10–14 of the Vrana patent. It now asserts only claims 2 and 4 of the patent. The products in issue are the T700 engines manufactured by the General Electric Company ("GE") and supplied to the Departments of the Army and Navy.

Plaintiff is a Canadian corporation having its principal place of business at 1000 Marie–Victorin Blvd., Longueuil, Quebec J4K 4X9, Canada. Plaintiff has previously been known as United Aircraft of Canada Limited and as Pratt & Whitney Aircraft of Canada Limited. PWC is a majority owned subsidiary of United Technologies Corporation ("UTC"), formerly United Aircraft Corporation. Since 1964, PWC has been a member of the Pratt & Whitney Aircraft group within UTC.

Defendant, the United States of America, disclaims liability on three grounds: (1) the accused diffuser does not infringe claims 2 and 4 of the Vrana patent; (2) claims 2 and 4 are invalid for obviousness; and (3) laches precludes recovery for accused diffusers. Only the liability issue is before the Court.

## Facts

The Vrana patent, entitled "Diffuser for Centrifugal Compressor", issued August 1,

1967, in the name of John C. Vrana on a continuation-in-part application Serial No. 594,727, filed November 16, 1966, of patent application, Serial No. 410,642, filed November 12, 1964. The patent, which has been owned by PWC at all times material to the action, expired on August 1, 1984.

The Vrana patent disclosed a diffuser for use in centrifugal compressors. The diffuser has become known in the industry as a "pipe" diffuser and is regarded as a breakthrough invention in the compressor art.[1]

### The Accused Device

The accused device is the Advanced Dump Diffuser in the centrifugal compressor of the T700 turboshaft helicopter engine manufactured by the General Electric Company. The centrifugal compressor provides high pressure, relatively low velocity air flow to the engine's combustor where the air is mixed with fuel and burned to generate a large volume of hot gases which rotate the engine's turbines. Air entering the engine is initially compressed by an axial compressor and then undergoes further compression in the centrifugal compressor. The components of the centrifugal compressor include a rotating impeller and a stationary diffuser.

The Advanced Dump Diffuser is an annular ring surrounding the impeller of the centrifugal compressor and is composed of 31 quasi-rectangular expanding passages. The inlet to each passage is adjacent to the impeller tip. Adjacent passages intersect at their inlets to form a swept back leading edge.

As air enters the centrifugal compressor, it is sucked into the center of a disc shaped rotating impeller. The vanes on the impeller whirl the air round and centrifugal force accelerates the air radially between the impeller vanes. The high velocity air exiting the tip (rim) of the impeller enters the inlets to the passages of the diffuser. As the air decelerates in the expanding passages, the pressure of the air is increased. At the outer rim of the diffuser, the air exits each passage and enters a dump (a plenum chamber) for further diffusion. At the opposite end of the dump, air passes through a row of deswirling vanes and then enters the combustor. The combination of the diffuser, dump and deswirling vanes in the T700 engine is denoted as the Advanced Dump Diffuser/Deswirler.

The performance of a diffuser is measured by (1) its efficiency in converting air velocity into air pressure and (2) its range of air flow volume that it can efficiently diffuse. Because the diffuser is one component of the centrifugal compressor, an increase in the efficiency of the diffuser results in a smaller proportional increase in the efficiency of the overall axial-centrifugal compressor and improvement in the specific fuel consumption of the T700 engine.

Defendant has purchased from GE at least one engine bearing each of the following designations: T700/GE–700, T700/GE–701 and T700/GE–401.

The centrifugal compressor and diffuser for the centrifugal compressor function and operate in an identical manner in all T700 engines which defendant has purchased. As of April 6, 1983, 1,045 T700 engines were shipped to the U.S. Army, an additional 252 engines were on contract to be shipped, and a multi-year proposal required the shipment of an additional 433 engines. The total number of accused engines is 1,730.

The diffuser of the centrifugal compressor in the T700 engine is a pipe diffuser and is referred to by GE as an advanced dump diffuser. In the advanced dump diffuser, the configuration of the passages downstream of the throat is transformed from a circular cross-section at the throat to a quasi-rectangular cross-section formed of two straight surfaces and two curved surfaces. The length of the throat and the configuration of the diffuser section downstream of the throat are non-critical features of a pipe diffuser.

---

**1.** The pipe diffuser is depicted in plaintiff's exhibit 10, Figs. 3 and 4, which is attached hereto as Appendix 1.

PWC contends that the T700 engine infringes claims 2 and 4 in the Vrana patent. Claim 2 is dependent on claim 1 and claim 4 is dependent on claim 2. Claims 1, 2 and 4 are as follows:

1. In a centrifugal compressor of the type having a rotary impeller, a diffuser comprising an annular member having an inner circumference closely surrounding the impeller, a plurality of intersecting passages in said annular member extending outwardly from said inner circumference, each of said passages being substantially straight from the inner end of the passage to a point downstream of its intersection with adjacent passages, *said passages being curvilinear in transverse section,* the center lines of the substantially straight portions of said passages being tangent to a common tangency circle having approximately the same diameter as the impeller, said center lines being also adapted to intersect the center lines of adjacent passages at a distance outward from said common circle having a length less than one-half the maximum transverse dimension of the passage measured at a point near the intersection of adjacent passages. (Emphasis added.)

2. A centrifugal compressor as in claim 1 in which adjacent passages are so closely spaced that the wall surfaces of adjacent passages meet at a point outward of the inner circumference of the diffuser and define at their intersections a substantially sharp dividing wall having a curvilinear leading edge that is swept back in the direction of flow through the diffuser.

4. A centrifugal compressor as in claim 2 in which the passages are circular and the leading edge elliptical.

### Discussion
### I. *Infringement*
### A. *Claim Construction*

■ PWC has the burden of proving infringement by a preponderance of the evidence. *Lemelson v. United States,* 752 F.2d 1538, 1547 (Fed.Cir.1985). The Government has the burden of proving that the claims of the Vrana patent are invalid by clear and convincing evidence. 35 U.S.C. § 282 (1982); *Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861, 872 (Fed.Cir. 1985).

■ Analysis of patent infringement entails two inquiries: the determination of the scope of the claims as a matter of law and the factual finding of whether properly construed claims encompass the accused structure. *Texas Instruments, Inc. v. United States International Trade Commission,* 805 F.2d 1558, 1562 (Fed.Cir. 1986); *McGill, Inc. v. John Zink Co.,* 736 F.2d 666 (Fed.Cir.1984). To avoid infringement, the Government need only show noninfringement of independent claim 1 because a dependent claim cannot be infringed unless the accused device is also covered by the related independent claim. *Teledyne McCormick Selph v. United States,* 214 Ct.Cl. 672, 679, 558 F.2d 1000, 1004 (1977).

■ *Literal infringement requires that the accused device embody every element of the claim as properly construed. Texas Instruments, Inc.,* 805 F.2d at 1562. The omission of any one of the elements making up the claimed combination avoids infringement. *Strumskis v. United States,* 200 Ct.Cl. 668, 676, 474 F.2d 623, *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973).

■ One who in good faith wishes to avoid infringement has a right to rely, in a reasonable manner, on what the patent, including the specification, describes when determining the claim boundaries. *General Electric Co. v. Wabash Co.,* 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402 (1938); *White v. Dunbar,* 119 U.S. 47, 7 S.Ct. 72, 30 L.Ed. 303 (1886); *Kaiser Industries Corp. v. McLouth Steel Corp.,* 400 F.2d 36 (6th Cir.1968), *cert. denied,* 393 U.S. 1119, 89 S.Ct. 992, 22 L.Ed.2d 124 (1969).

The scope of a patent is defined by its claims. 35 U.S.C. § 112. Section 112

states that a claim shall particularly point out and distinctly claim the subject matter which the applicant regards as his invention.

■ The issue of infringement in this case centers on whether the third element of claim 1 which states "said passages being curvilinear in transverse section" is present in the Advanced Dump Diffuser used in the GE–T700 engine.

The meaning of "said passages being curvilinear in transverse section" is determined by reference to claim 1, the Vrana patent specification and its figures, other claims, the prosecution history of the Vrana patent before the Patent Office and expert testimony. There are disputes regarding the meaning of the terms "passages" and "curvilinear." The term "transverse section" has been stipulated as being synonymous with cross section.

The term "passages" as used in the claims of the Vrana patent is defined in the Vrana patent specification as "passages 14." The Vrana patent specification states that passages (14) extend from the inner to outer circumference of the annular ring member as is evidenced by the following description from the Vrana patent of passages (14):

> From this point the passages 14 if they are of constant cross-sectional area, produce no further diffusion until downstream of this point the passages 14 begin to taper through the outer portion of the annular member 16.
>
> Thus, each of the passages 14 has a tapered portion 22 at the outer end to accommodate one of a plurality of tapering trumpet-like nozzles 18 which are mounted on annular member 16.

The passages (14) of the Vrana patent have a tapered portion (22) which extends to the outer circumference of the annular ring member (16). Into the end of each passage, a trumpet like nozzle (18) is inserted to receive the air exiting the passages. Other portions of the patent specification also indicate that the passages extend from the inner to outer circumference of the annular ring member. The specification states that "the present diffuser construc-

tion embodies an annular member closely surrounding the impeller and having a plurality circumferentially spaced passages *curvilinear in cross section and extending through the member * * * "* [emphasis supplied], "[t]rumpet-like diffusers are inserted in each of the passages bored through the annular members * * *", and "[a] main feature of the present invention is the formation of a plurality of passages 14 extending through the annular member 16 * * *."

Contrary to PWC's contention, the term passages (14) does not refer only to the cylindrical portion of each passage. PWC alleges that its interpretation of passages (14) is supported by the following sentence of the Vrana patent: "[w]hile the passages 14 are shown as being straight sided cylindrical passages, it is contemplated that they may be conical or any other formation that is curvilinear in cross section without departing from the scope of the invention." Mr. Kenny of PWC and Mr. King of GE testified that a cylindrical section must form a closed figure. The passages are cylindrical only for the short portion between the apex of the elliptical leading edge, shown in figure 4, and the beginning of the tapered portion (22). Upstream of this cylindrical portion is the pseudo-vaneless space (20) formed by the intersection of adjacent passages which is not cylindrical because it does not form a closed figure. To construe the term passages as limited solely to the cylindrical portion between the pseudo-vaneless space (20) and the tapered portion (22) would be inconsistent with: (1) claim 1 which states that the passages extend outwardly from the inner circumference of the annular ring; (2) the specification of the Vrana patent which states that the "passages 14 have a tapered portion 22"; (3) claims 8–14 which expressly state that "passages" extend from the inner to outer circumference of the annular member; and (4) the testimony of PWC and Government experts. While both of PWC's experts, David Kenny and Tsukasa Yosinaka, testified that the term passages includes the pseudo-vaneless space, Mr. Kenny testified that the term passages does

not include the cylindrical section. Lester King and Homer Wood, expert witnesses for the Government, testified that the passages extend through the annular member to the outer circumference of the annular member. Experts for both parties agreed that as a practical matter the passages must extend through the outer circumference of the annular member to allow the air flowing through the passages to pass to the combustor of the engine.

Construing the term "passages" to mean extending entirely through the annular diffuser does not result in claim 1 having the same scope as claim 8. Claim 1 requires only a portion of the passages to be straight, while claim 8 requires the diffuser passages to be "straight" in their entirety. Similarly, claim 1 requires the passages to be "curvilinear in transverse section," while claim 8 is more restrictive in that it requires the passages to be "circular" in cross section. The term "passages" is used consistently in claims 1 and 8, and claim 1 is distinct from claim 8.

While the term "curvilinear" is used in the specification and claims of the Vrana patent, the term is not defined in the patent. The patent states that "the passages 14 are shown as being straight sided cylindrical passages, it is contemplated that they may be conical or any other formation that is curvilinear in cross section without departing from the scope of the invention." Similarly, the patent states that "[t]he configuration desired is obtained by having the intersecting passages curvilinear in transverse cross section and selection of a particular cross sectional shape may be utilized to vary the elliptical configuration." Contrary to Mr. Kenny's testimony, neither of these quotations define curvilinear.

Each of the experts testified that the dictionary definition of the term "curvilinear" is consistent with the meaning of that term in the claims of the Vrana patent. The term "curvilinear" is defined as "consisting of or bounded by curved lines," in *Webster's Third New International Dictionary* (Unabridged), p. 558 (1981). Under this definition, a passage cross section is curvilinear only if the cross section is

formed entirely by curved lines. If any portion of the cross section is straight, then the cross section is not curvilinear. Moreover, a curvilinear cross section is one without corners. Corners in a diffuser passage create secondary airflows which reduce diffuser efficiency.

Claim 1 requires the entire length of the passage to be curvilinear in cross section. Claim 1, the figures in the Vrana patent and the prosecution history of the Vrana patent all indicate that the entire length of each passage is curvilinear in cross section. Where claim 1 imposes limitations applicable to only a portion of the passage it so states, such as "passages being substantially straight from the inner end of the passage to a point downstream of its intersection with adjacent passages," and "the centerlines of the substantially straight portions of said passages being tangent to a common tangency circle." Mr. Warren, PWC's patent attorney who wrote claim 1, and Mr. Yoshinaka, PWC's expert on infringement, testified that claim 1 requires the entire passage to be curvilinear.

The passages of the Vrana pipe diffuser are curvilinear in cross section throughout their length because of aerodynamic and manufacturing considerations. Curvilinear passages have no corners and, consequently, avoid the creation of secondary airflows in the passages. Moreover, the Vrana patent states that the passages are formed by boring through the annular member. As such, the passages will be curvilinear throughout due to boring. According to credible testimony, Mr. Vrana believed that his method of boring the diffuser passages was patentable and did not believe that the swept back leading edges formed during the boring operation were patentable in view of an earlier Dallenbach patent.

**B. *Literal Infringement***

The Advanced Dump Diffuser does not have passages which are curvilinear in transverse section as required by claim 1 and, therefore, does not literally infringe claims 1, 2 and 4 of the Vrana patent.

### C. *Prosecution History Estoppel*

The patent specification limits the scope of equivalents to be afforded the claims of the patent to passages which are curvilinear. The specification states that the passages may be straight sided cylindrical, conical, or "any other formation that is curvilinear in cross section without departing from the scope of the invention."

PWC is not entitled to a range of equivalents which would encompass passages which are non-curvilinear in cross section because the specification limits the scope of the invention to passages which are curvilinear in cross section.

To avoid an earlier Buchi patent, cited as prior art by the patent examiner, PWC argued that the Vrana pipe diffuser was distinguishable because in the Buchi diffuser the entire passage is trapezoidal whereas in Vrana the passages are circular or curvilinear.

PWC argued that the trapezoidal passage described in the Buchi patent was not curvilinear. However, the trapezoidal passage depicted in the Buchi patent is described as having rounded corners with a relatively great radius of curvature.

From PWC's statement regarding the Buchi patent, the term curvilinear, as used to describe the passages in the Vrana patent, must mean consisting only of curved lines, which is in accord with the dictionary definition of curvilinear. In view of the representations that PWC made to the patent examiner, PWC gave up any right it may have had to claim coverage of non-curvilinear passages.

### D. *Infringement Under the Doctrine of Equivalents*

■ The doctrine of equivalents comes into play only when literal infringement is not present. Under the doctrine of equivalents, a device that does not literally infringe a claim may be found to be infringing "if it performs substantially the same function in substantially the same way to obtain the same result" as the claimed apparatus. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S.

605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). PWC has the burden of establishing equivalents. *Lemelson v. United States*, 752 F.2d at 1550.

■ To determine whether claims 2 and 4 are infringed under the doctrine of equivalents, the entire Advanced Dump Diffuser must be compared to the Vrana pipe diffuser. For there to be equivalents, the Advanced Dump Diffuser must (1) have substantially the same function; (2) operate in substantially the same way; and (3) achieve substantially the same result as does the Vrana pipe diffuser defined in claims 2 and 4.

■ The function of the Advanced Dump Diffuser and the Vrana pipe diffuser are substantially different in that the Vrana pipe diffuser transmits the air through curvilinear passages into an array of discrete trumpet diffusers in contrast to the Advanced Dump Diffuser which dumps air into an annular plenum chamber from quasi-rectangular passages having sharp trailing edges.

The operation of the Vrana pipe diffuser is substantially different from that of the Advanced Dump Diffuser because the curvilinear passages of the Vrana pipe diffuser handle the airflow in a different manner than do the quasi-rectangular passages and sharp trailing edges of the Advanced Dump Diffuser. The curvilinear passages of the Vrana pipe diffuser have an ideal cross sectional shape for diffusion because the passages presents the minimum surface area against the airflow and have no corners to create detrimental secondary airflows. The quasi-rectangular passages of the Advanced Dump Diffuser do not present the minimum surface area and have corners which create secondary airflow. These secondary airflows reduce the efficiency of the diffuser and can cause flow separation in the passages. The quasi-rectangular passages of the Advanced Dump Diffuser have sharp trailing edges which reduce the pressure losses occurring as the air exits the passages and mixes with the air exiting adjacent passages. The sharp trailing edges of the Advanced Dump Diffuser create relatively small

zones of dead air at the exit of the diffuser. At the exit of a Vrana pipe diffuser, assuming no trumpet diffusers, blunt trailing edges formed by the curvilinear passages would generate relatively large zones of dead air downstream of the diffuser. In practice, trumpet diffusers are inserted in each of the passages of a Vrana pipe diffuser, in part, to avoid the effect of the blunt trailing edges.

The result achieved by the Vrana pipe diffuser is substantially different from the result achieved by the Advanced Dump Diffuser. The resulting structure of a complete diffusion system incorporating a Vrana pipe diffuser includes the trumpet diffusers which diffuses and turns the airflow into the combustor. Finally, the condition of the airflow in a Vrana pipe diffuser differs from that in the Advanced Dump Diffuser. The curvilinear passage of the Vrana pipe diffuser create no secondary airflows but require trumpet diffusers to avoid the zones of dead air caused by the blunt trailing edges of the passages. In contrast, the quasi-rectangular passages of the Advanced Dump Diffusers create secondary airflows in the passages and the sharp trailing edges greatly reduce zones of dead air at the diffuser exit.

After weighing the evidence presented at trial, including exhibits and witness testimony, the Court concludes that the Government has met its burden of presenting more credible evidence. It has done so by a clear and convincing standard.

## II. *Obviousness*

Defendant relies upon a second defense of obviousness. *See* 35 U.S.C. § 103. As the Supreme Court has stated, section 103 requires an inquiry as follows:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unresolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966); *Orthopedic Equipment Co. v. United States*, 702 F.2d 1005, 1008 (Fed.Cir.1983).

■ Secondary considerations must be considered in determining obviousness provided that a nexus is established between each secondary consideration and the patented device. *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 315 (Fed.Cir. 1985); *Stratoflex Inc. v. Aeroquip Corp.*, 713 F.2d 1530 (Fed.Cir.1983).

■ In determining obviousness, the claimed device must be considered as a whole. *In re Sovish*, 769 F.2d 738, 742 (Fed.Cir.1985); *Pentec*, 776 F.2d at 315.

Credible expert testimony at trial revealed that a person of ordinary skill in the art of aerodynamic design of centrifugal compressor in the period 1962–66 would have had at least a Masters Degree in Mechanical Engineering and had studied fluid dynamics and thermodynamics. He should also have successfully completed a design in the art of centrifugal compressors or understood a particular problem in the development of such a design and successfully solved the problem.

After evaluating expert testimony, the Court finds that persons skilled in the art were familiar with a wide variety of diffusers such as vane diffusers and discrete passage diffusers which encompass vane island diffusers having passages rectangular in cross section and pipe diffusers having passages circular in cross section.

Persons of ordinary skill in the art were not, however, inclined to take unusual or radical steps in the design of centrifugal compressors.

Defendant has argued two combinations of six prior art references which defendant contends render the subject matter of claims 2 and 4 invalid for obviousness.

The first combination includes a Keller U.S. patent No. 2,708,883; a Cook U.S. patent No. 2,925,714; and an excerpt from the book "Centrifugal and Axial Flow

Pumps," by A.J. Steppanoff, revised 1957. The second combination includes a Dallenbach et al. U.S. patent No. 2,967,013; a Price British patent No. 170,815; and a 1959 Dean and Senoo paper entitled "Rotating Waves in Vaneless Diffusers."

The Keller patent, the Dallenbach et al. patent, and the Price British patent, were cited by the Patent Office during the prosecution of the Vrana patent. The Cook patent discloses an impractical regenerator according to credible expert testimony. The 1959 Dean and Senoo paper relates to the use of a vaneless space between the impeller and the leading edges of the vanes of a vane diffuser and suggests that acceptable uniformity would be achieved with a vaneless space between 5 percent and 10 percent of the rotor diameter.

The scope and content of the prior art references and the differences between the prior art and the claims at issue relied upon by the Government are not so convincing, *when considered alone,* to render obvious the subject matter of claims 1, 2, and 4 of the Vrana patent.

Secondary considerations, however, "give light to the circumstances * * * [a]s indicia of obviousness or nonobviousness, [and] these inquiries * * * have relevancy." *See Graham v. John Deere Co.,* 383 U.S. at 17, 86 S.Ct. at 693.

A *Commercial Success*

Since 1967, PWC has sold more than 30,000 small gas turbine engines. Each of the engines has incorporated a pipe diffuser. PWC's sales of its engines have been helped by the patented pipe diffuser. The pipe diffuser has improved the efficiency of the engines, the engines have lower fuel consumption rates than they would have had, the compressor sections are structurally durable, and the overall performance and reliability of the engines has been enhanced. *However the Vrana pipe diffuser has not been generally adopted by the aircraft industry. Despite offering licenses to others in the industry, PWC has been unsuccessful in licensing the Vrana patent.*

Improved pipe diffusers of the Vrana type have been incorporated in the 1,730 T700 engines manufactured by GE for the Government. The T700 engine developed out of a follow-on program for the GE–12 demonstration engine. During that program, the Court believes there was a need for GE to use a pipe diffuser in the centrifugal compressor.

B *Skepticism*

In March 1968, Mr. David Kenny delivered a valuable paper entitled "A Novel Low Cost Diffuser for High Performance Centrifugal Compressors" to a session of the American Society of Mechanical Engineers (ASME). This was the first public disclosure by PWC of the patented pipe diffuser. Several attendees at the conference represented GE and were involved in the design and development of gas turbine engines.

Mr. Kenny's paper evoked a great deal of interest because of its description of a diffuser design that was different. The paper was also met with much skepticism because the pipe diffuser design was so different.

C *Copying*

Nevertheless, the Government contends that Alex Bryans, a GE engineer, independently conceived a discrete passage diffuser similar to the Vrana pipe diffuser. The Government argues that at that time Mr. Bryans was unaware of the Vrana patent.

The issue of copying consumed days in the trial of this case. Mr. Bryans testified and was recalled from Massachusetts at the request of the Court to explain his actions. After long, laborious and expert questioning (Mr. Bryans is deaf and cannot read sign language. Questions were submitted to him in writing, verified by the Court and filed as an exhibit), it became clear to the Court that a central issue in the case revolved around his credibility.

GE's first design of a pipe diffuser occurred in June 1968, six years after PWC's initial work on pipe diffusers, 10 months after issuance of the Vrana patent and 3 months after Mr. Kenny's paper, was re-

ceived in GE's Technical Information Center and circulated to several individuals involved in the design of the GE 12 demonstrator engine.

GE's next work relating to pipe diffusers occurred during a follow-on program for the GE12 engine in the time period 1970–71. Before any of the pipe diffusers tested during the follow-on program were made, a GE engineer responsible for the design of the pipe diffusers had reviewed PX 51 entitled "Evaluation of a High Hub/Tip Ratio Centrifugal Compressor", a paper presented by Pratt & Whitney engineers at an ASME meeting in November 1969. All the pipe diffuser designs tested by GE during the follow-on program were similar to the PWC pipe diffusers, including the use of the same number of passages (31). The 31 passage pipe diffuser, selected by GE for use in the centrifugal compressor of the T700 engine, was later modified to incorporate a cylindrical throat, as described in the Vrana patent, Mr. Kenny's 1968 article, and the PX 51 technical paper.

Circumstantial evidence presented by PWC at trial weighed heavily in favor of its contention that GE obtained information about PWC's Vrana patent and used that information for GE's benefit. But questioning by expert PWC attorneys was never able to shake Mr. Bryans. His testimony hung together, and in the face of strong circumstantial evidence to the contrary, made a believable story.

The Court itself, having considerable and significant doubts raised by the circumstances, undertook to question Mr. Bryans on several occasions—more than normal in the average trial. The Court looked Mr. Bryans in the eye, evaluated his demeanor and his answers, his education, background, and notable achievements in his discipline, and found Mr. Bryans to be an extremely credible and competent witness. Thus, the Court concludes that Alex Bryans, a GE engineer in 1968, independently conceived a discrete passage diffuser similar to the Vrana pipe diffuser.

■ Independent conception of a patented device suggests its obviousness. *Concrete Appliances Co. v. Gomery*, 269

U.S. 177, 185, 46 S.Ct. 42, 45, 70 L.Ed. 222 (1925); *Vandenberg v. Dairy Equipment Co.*, 740 F.2d 1560, 1567–68 (Fed.Cir.1984). In *Vandenberg*, sketches and development of a device made after but without knowledge of a similar patented device suggested that the patented device would have been obvious. *Vandenberg*, 740 F.2d at 1562, 1564, 1566, 1567–68. Evidence of independent development of a patented device is indicative of obviousness if the circumstances of the development are shown to be similar to the state of the art when the patent was filed. *Stewart–Warner Corp. v. Pontiac*, 767 F.2d 1563, 1570 (Fed. Cir.1985).

■ In 1968 during the GE 12 Demonstrator Engine Program, Alex Bryans designed a discrete passage diffuser to be manufactured by Electrical Discharge Machining (EDM). His discrete passage diffuser was composed of 45 straight conical passages tangent to the impeller. The passages were conical and intersected at the inlet. As the EDM method at that time required a rotating mandrel to create each diffusion passage, the inlet was circular in cross section and the swept back leading edges were inherently formed by the intersecting passages. Mr. Bryans viewed the swept back leading edge as a limitation of the EDM Process and did not believe that the swept back leading edge provided a performance advantage.

The Court is convinced that Mr. Bryans designed his discrete passage diffuser unaware of the Vrana patent which issued in 1967 and unaware of Mr. Kenny's paper presented in 1968 at a conference, which Mr. Bryans did not attend.

It is not surprising to the Court that Mr. Bryans, given his notable achievements in his profession, independently designed a discrete passage diffuser similar to the Vrana pipe diffuser after selecting EDM as its method of manufacture. With respect to diffusers having straight conical passages, the design constraints imposed on the diffuser define, to a first order of approximation, the arrangement of diffusion passages and leading edge geometry.

Defendant prevails in its argument of obviousness based on the convincing testimony of Alex Bryans *and* the other secondary considerations which "give light to the circumstances." *Graham v. John Deere Co.*, 383 U.S. at 17, 86 S.Ct. at 693 (1966). The Court finds that a nexus exists between the invention and the secondary considerations discussed above, and therefore the evidence presented is relevant, and the secondary considerations are significant, probative, and revealing. *See* H.F. Schwartz, *Patent Law and Practice*, 51–56 (Federal Judicial Center 1988).

### III. *Laches*

 To assert the defense of laches, defendant must prove two essential elements: (1) unreasonable and inexcusable delay in the assertion of the claim; and (2) material prejudice to the defendant resulting from this delay. *Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734 (Fed.Cir. 1984). A 6–year delay between the patentee's first knowledge of infringement and filing of suit raises a rebuttable presumption of laches. *Leinoff, supra.* Laches must be proven by the defendant by a preponderance of the evidence. *Moore v. Shultz*, 491 F.2d 294 (10th Cir.), *cert. denied*, 491 U.S. 930, 95 S.Ct. 203, 42 L.Ed.2d 161 (1974).

The burden of proof encompasses both the burden of producing evidence and the burden of persuasion. C. McCormick, *Evidence* § 346 (3d ed. 1984). While the burden of coming forward with evidence shifts during the case from one party to another, the burden of persuasion never shifts from defendant. *Id. See also* Rule 301, Fed.R. Evid.

 The defendant bears the ultimate burden of persuasion (i.e., of showing *both* unreasonable, inexcusable delay and prejudice). If a preponderance of the evidence fails to support either finding, the defense of laches fails. *See, Studiengesellschaft Kohle mbH v. Eastman Kodak Co.*, 616 F.2d 1315 (5th Cir.1980); *TWM Manufacturing Co., Inc. v. Dura Corp.*, 592 F.2d 346 (6th Cir.1979).

 In order to rebut the presumption of laches, the patentee need only rebut the presumption of prejudice, or show a good excuse, or show bad faith on the part of the defendant. *TWM Manufacturing Co., Inc. v. Dura Corp., supra*, at 349. A showing of excusable delay successfully rebuts the 6–year laches presumption. *Studiengesellschaft, supra. Leinoff* does not mandate that both the presumption of delay and the presumption of prejudice be rebutted in order to defeat laches based on the 6–year delay presumption. This is clear because the cases cited by the *Leinoff* court for support of the 6–year presumption are the *Studiengesellschaft* case and the *TWM Manufacturing* case. Furthermore, such a mandate would run contrary to the effect of presumptions under the Federal Rules of Evidence and the case law. *See generally*, Schwartz, *Patent Law and Practice, supra*, at 77–78.

In federal civil cases, Rule 301 requires the ultimate burden of persuasion to remain with the party asserting the presumption, unless Congress has otherwise provided. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976); *Panduit Corp. v. Allstates Plastic Manufacturing Co., Inc.* 744 F.2d 1564 (Fed.Cir.1984); and *Commonwealth of Pennsylvania v. United States*, 226 Ct.Cl. 444, 643 F.2d 758 (1981). Ordinarily, the burden is satisfied by evidence which, viewed in the aspect most reasonable to the burdened party, is sufficient to enable the trier of fact to find in his favor. C. McCormick, *Evidence* § 338 (3d ed. 1984). To rebut a presumption, evidence must be legally sufficient to support a finding contrary to the presumed fact. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Del Vecchio v. Bowers*, 296 U.S. 280, 56 S.Ct. 190, 80 L.Ed. 229 (1935); and *McCormick, supra*, § 345. The only legal effect of a presumption is to require production of *some* evidence to the contrary. *Mobile, J. & K. C.R.R. v. Turnipseed*, 219 U.S. 35, 31 S.Ct. 136, 55 L.Ed. 78 (1910).

Presumptions are not evidence. *Lincoln v. French*, 105 U.S. 614, 26 L.Ed. 1189 (1881), and *Panduit, supra.* Presumptions

are never allowed to control against ascertained and established facts. *Lincoln, supra.* When facts appear, presumptions disappear. *Lincoln, supra.* When a presumption is rebutted, it "falls out of the case." *Del Vecchio, supra,* at 286, 56 S.Ct. at 193. The theory that a presumption ceases to exist when successfully rebutted is known as "bursting bubble" and is also the theory expressed in Rule 301, Fed.R. Evid. *Legille v. Dann,* 544 F.2d 1 (D.C.Cir. 1976).

■ Accordingly, plaintiff need only produce some evidence sufficient to support a finding that either (1) the delay was not inexcusable or (2) there was no prejudice to the defendant or (3) defendant acted in bad faith. Since it is defendant's burden of persuasion, which never shifts, on all of these issues, plaintiff's quantum of proof is some evidence less than a preponderance.

The accused T700 engines were first produced and delivered by GE to the Government in 1978.

In the mid–1970's, Robert Langworthy, an Army engineer responsible for monitoring compressor work in GE's GE–12 and T700 development programs, knew of the existence of the Vrana patent and he knew that the patent related to pipe diffusers. It occurred to Mr. Langworthy that there was a possible infringement situation so he asked GE personnel whether they had considered it. In response, GE engineers said there was no infringement.

Before the T700 engine production contract was signed in 1976, PWC's David Kenny and Robert Langworthy discussed the Vrana patent and the GE pipe diffuser. When Mr. Kenny mentioned the possibility of infringement, Mr. Langworthy responded that he had discussed the matter with GE personnel who had advised him that the GE diffuser differed from PWC's. At trial Mr. Langworthy did not recall if he told anyone in the Government about his conversation with Mr. Kenny. When GE represented that it did not infringe the Vrana patent, that was the end of the matter as far as Mr. Langworthy was concerned. He did not pursue it further.

During the period 1975–77, another Government monitor of compressor design in the T700 engine development, engineer Michael Galvas, believed that the GE diffuser infringed the Vrana patent and he expressed his views to GE's Messrs. Blair and King. Mr. Blair responded by saying that this was a legal matter and Mr. King said that there was no infringement. Although Mr. Galvas still believed that there was infringement, he did not inform his superiors in the Government, or Government contract officers or Government lawyers. Mr. Galvas believed that GE would handle the possible patent infringement issue. He had no authority at that time to direct GE to change the diffuser design to avoid patent infringement and he knew of no one in the Government who would have had the authority to tell contractors not to adopt a particular design. Mr. Galvas knew of no way that PWC personnel would have known, in the period 1971–75, that a pipe diffuser was being proposed by GE for the T700 production engine. Moreover, in the 1970's Mr. Galvas had no reason to believe that PWC would not seek to enforce the Vrana patent against use of the T700 diffuser.

Some time in 1974, PWC's David Kenny was shown a photograph of a diffuser made by Ace Industries for the T700 engine then under development by GE pursuant to a contract with the U.S. Army. Mr. Kenny did not have a copy of the Vrana patent with him at the time he viewed the photograph, but he believed that it *might* be an infringement if put into use.

In December 1976, PWC received information concerning a diffuser made by Ace Industries for the GE T700 engine. PWC's Gerald Gagnon informed Russell Lipes, Jr., an attorney in UTC's Patent Department, of the possible use of a pipe diffuser by GE in the T700 engine and asked Mr. Lipes to check into the matter. In February 1977, PWC reported to Mr. Lipes that Ace had informed PWC that it had made some pre-production pipe diffusers for the GE T700 engine and was gearing up for anticipated production. PWC asked Mr. Lipes to attempt to get more specific information from UTC's Sikorsky subsidiary which was

making the UTTAS helicopter to be powered by the GE T700 engine. Mr. Lipes could obtain only sketchy information from Sikorsky and advised PWC to look elsewhere for a showing of the GE T700 engine construction.

Later in 1977, Ernest Dueck of PWC visited the plant of Ace Industries in California and saw a diffuser made by Ace for a GE engine in the T700 development program. Mr. Dueck prepared a written trip report which included a sketch of the cross-section of the diffuser he had seen at Ace and submitted it to his management. Mr. Dueck was told that future diffusers to be made by Ace for the GE T700 engine would be different from the one shown to him.

In January 1979, PWC personnel made another visit to the Ace Industries facilities and were advised that Ace was in the process of gearing up to produce pipe diffusers for the GE T700 engine at a production rate of 35 a month. This information was communicated to PWC management. Mr. Lipes continued his efforts to obtain details of the diffuser being made for the T700 engine so that he could complete his infringement analysis. Mr. Lipes then recommended to his superior at UTC and PWC management that steps be taken to bring the Vrana patent to GE's attention.

In an effort to resolve the question of infringement of the Vrana patent by the T700 engine, PWC offered GE a license under the patent in January 1979. GE declined the license offer in April 1979.

A month after GE declined PWC's license offer, PWC, on May 22, 1979, sent letters to the Army, Navy and Air Force informing each of them of PWC's belief that the T700 engines made by GE for the military used the invention of the Vrana patent and suggested discussion of a license under the patent as a way of resolving the matter. PWC's May 22, 1979, letters to the Army, Navy and Air Force identified the Vrana patent by number and subject matter, alleged use by the services of the invention of the patent in the GE T700 engine and offered to discuss a license to the Government under the patent. As such, the letters stated the elements of an administrative claim as specified in Army and Navy regulations. PWC fulfilled all of the requirements of an administrative claim.

The Army labeled the matter as a proffer of license. If the PWC letter of May 22, 1979, had been considered as an administrative claim, the Navy would have had no choice but to immediately deny it due to the fact that no procurement had yet occurred. However, the Navy denominated PWC's request for compensation as a proffer of license.

PWC's May 22, 1979, letter to the military services was acknowledged by each and investigations into the infringement and validity issues raised by the letter were undertaken by the Army and the Navy. The Air Force advised PWC in September 1979 that it had no interest in the Vrana patent because it did not procure T700 engines.

PWC's offer of a license was treated procedurally the same way as a claim for compensation.

During the nearly 5–year period during which the PWC matter was considered, the Government indicated that the Vrana patent was invalid in light of a number of different combinations of prior art. Each time that PWC persuaded the Government that a particular combination of the prior art did not invalidate the Vrana patent, a new search was undertaken and a new position on invalidity was espoused.

During the pendency of the PWC negotiations, patent counsel for the Army, Mr. Lane, believed that PWC was acting in good faith. *The Army's patent counsel testified that he never considered settlement to be an impossibility until suit was filed.*

Before and early into the negotiations with the Army and Navy for a license under the Vrana patent covering the GE T700 engine, PWC engaged in negotiations with AVOC–Lycoming for a license under the Vrana patent and another PWC patent relating to air particle separators. The negotiations ended without result as far as the Vrana patent was concerned.

In the course of the negotiations with the Government involving the T700 engine, PWC disclosed to the Government that it had previously discussed a license with AVCO–Lycoming based on a lump sum down payment and continuing running royalties. The royalty figures discussed with AVCO–Lycoming were a much smaller specified number of dollars per engine, rather than a royalty percentage. These figures were not relevant to PWC's negotiations with the Government on the T700 engine because the AVCO–Lycoming engines were considerably smaller than the T700 engines, and AVCO–Lycoming was not a significant competitor of PWC.

From the time the Army and the Navy acknowledged receipt of PWC's May 22, 1979, letter until the filing of this lawsuit on March 5, 1984, PWC and the Army and the Navy engaged in continuing bilateral negotiations attempting to reach a settlement of the matter. In the period February 1981 through April 1983, PWC representatives met with Government officials five different times. During the meetings, proposed license terms were discussed, as well as various prior art references raised by the Army and Navy representatives as bearing on the validity of the Vrana patent. PWC representatives understood from the discussions at the meetings that the Army and Navy representatives believed that the pipe diffuser employed in the T700 engine may have infringed claims of the Vrana patent.

PWC was concerned about the length of time the Army and Navy were taking to investigate the matter and pressed the Army, which had primary responsibility for the investigation, to move the matter along. Almost a year was required for the Army attorneys investigating the matter to obtain sufficient information from GE concerning the diffuser to enable them to make an infringement analysis. The investigation period was extended further by multiple validity searches and studies made first by the Army and then, at GE's insistence and with GE's search results, by the Navy.

At a meeting on January 5, 1983, with Army and Navy patent counsel, a representative of PWC expressed his impatience with the pace of the negotiations and stated PWC's intention to proceed with a suit in this Court if a license agreement could not be negotiated. Mr. Lane indicated that about a month would be needed to complete the investigation.

In April 1983, PWC was told by Army representatives that they were prepared to go ahead with this determination even though, at GE's urging, the Navy was still in the process of conducting its validity investigation and had asked the Army not to move forward. The Army nevertheless waited until the Navy validity study was completed and the results communicated to PWC's counsel. PWC's counsel responded to the validity questions raised by the Navy but received no response to the arguments presented.

The Court finds that PWC filed this action in March 1984, having received no response to its further inquiries, and concerned that the 6–year period of recovery permitted by 35 U.S.C. § 286 might affect its right to compensation for T700 engine deliveries that began in 1978.

There was no inexcusable delay by PWC in the initiation of the present action, nor a delay that prejudiced the Government. The laches defense must fail. PWC has met its burden by producing evidence on this issue beyond the preponderance standard.

### IV. *Conclusion*

Defendant prevails on the issues of infringement and obviousness. Plaintiff prevails on the issue of laches. Defendant prevails in the action, and the Clerk is directed to dismiss the complaint and to enter judgment to that effect this date. No costs, except as to separate Orders entered this same date.

This action has been persistently plagued by unpleasant accusations and cross-accusations on all sides (PWC, the Government, and non-party witness, GE) concerning alleged protective order violations.

Accordingly, this opinion shall be filed *in camera* and *copies circulated only to counsel for PWC, the Government, and GE*. Provisions for access under protective orders earlier issued by the Court shall remain in effect.

Counsel for PWC, the Government and GE shall have 10 days from the filing of the Opinion to review its contents for protective order material.

If protective order material is found in the Opinion, counsel shall file, within 10 days of the date the Opinion is filed, a notification with the Court. Counsel shall also file a proposed redacted version of the Opinion pending a hearing to be held on the matter. The redacted version shall delete any proprietary material. If a hearing is held on the issue of redaction, the presiding judge shall determine what material should be redacted or released.

In the event no notification is received from counsel within the above time frame (within 10 days after the Opinion is filed), the Clerk is directed to publish the Opinion.

IT IS SO ORDERED.